No. 43,137

In the Matter of the Accusation for Disbarment of PAYNE H. RATNER
and PAYNE H. RATNER, JR.

(399 P. 2d 865)

Opinion filed March 6, 1965.

*Robert E. Hoffman,* Assistant Attorney General, argued the cause, and *Robert C. Londerholm,* Attorney General, was with him on the briefs for the accusers.

*Eugene G. Coombs* and *Harry E. Robbins, Jr.,* both of Wichita, argued the cause, and *William H. Dye, John M. Reiff, Lyndon Gamelson* and *Donald C. Tinker, Jr.,* all of Wichita, were with him on the briefs for the accused.

The opinion of the court was delivered by

FONTRON, J.: On April 13, 1962, the State Board of Law Examiners commenced this proceeding to disbar Payne H. Ratner, who will sometimes be referred to as Payne, Sr., and his son, Payne H. Ratner, Jr., at times called Payne, Jr., herein, by filing against them an accusation pursuant to the provisions of G. S. 1949, 7-112 (now K. S. A. 7-112). The accusation was later amended but will be referred to in the course of this opinion as the accusation.

A brief synopsis of the events leading up to the filing of the accusation, as found by the Commissioner and disclosed by evidence of record, may be helpful in providing background and perspective. In 1954, Payne H. Ratner was appointed regional counsel for the Brotherhood of the Railroad Trainmen, and in 1957, Payne, Jr., was likewise appointed. Sometime after the appointment of Payne, Sr., his activities as regional counsel for the Brotherhood and as counsel for individual claimants under the Federal Employers' Liability Act, became the subject of inquiry by railroad claim agents and adjusters, and their investigation was later broadened to include Payne, Jr., as well.

In March, 1961, a complaint concerning the activities of both Payne H. Ratner and Payne H. Ratner, Jr., who hereinafter will often be designated together as respondents, was lodged with the mem-

bers of the State Board of Law Examiners, hereafter called accusers, by a committee of the Wichita Bar Association. This complaint was referred to the attorney general for investigation. The following November the accusers, the attorney general and members of his staff, and respondents and their counsel held an informal meeting at which the respondents were given an opportunity to discuss the matters contained in the complaint. Thereafter, and on February 14, 1962, the State Board of Law Examiners resolved that an accusation in disbarment be filed against respondents and directed the attorney general to proceed therewith.

According to Payne H. Ratner's testimony, which was not denied, he was told by the attorney general that if he would take a vacation for six months, disbarment proceedings would not be filed against him or his son. He was later told the Board of Law Examiners would not accept that type settlement but would proceed against both respondents unless he, Payne, Sr., would turn in his license with the understanding that the attorney general would not oppose his trying to get it back after a year. From the testimony of Mr. Dallas Knapp, secretary of the Board of Law Examiners, these conversations appear to have taken place without authorization from the Board. Sometime thereafter, Mr. Lloyd H. Ruppenthal, special counsel for the Board, visited the office of the respondents, at their invitation, and numerous files were made available for his inspection. Thereafter, the instant action was instituted.

After the accusation had been filed, this court appointed The Honorable Jerry E. Driscoll as Commissioner to hear the evidence and submit a report. On October 14, 1964, the Commissioner filed with the court comprehensive and detailed findings of fact and conclusions of law to which further reference will be made in the course of this opinion. We might say at this point, however, that the Commissioner found that none of the charges in the accusation were sustained by the evidence and, in conclusion, recommended that both respondents be discharged.

At the outset, it should be understood that the lengthy accusation levels no charges of fraud, dishonesty, or moral turpitude against either respondent. Neither are the charges predicated on any of the grounds for disbarment expressly enumerated in our statutes. However, we have held that the bases for revocation or suspension of an attorney's license to practice law are not restricted to those set out in the disbarment statute. (*In re Cox*, 164 Kan. 160, 188 P. 2d 652.) This court, in our judgment, has inherent authority to

discipline members of the Bar of this state whenever their conduct substantially fails to conform to the ethical standards prescribed for members of the legal profession, or whenever their activities become otherwise inimical to the just and orderly administration of law.

The gist of the charges on which the accusers now appear mainly to rely, since others were neither abstracted, briefed, nor argued, is that the respondents have engaged in unethical professional conduct in violation of the Canons of Professional Ethics adopted by the American Bar Association. No responsible attorney would deny that serious infractions of the canons are grounds for invoking disciplinary measures against offending lawyers. (*Judy & Gilbert v. Railway Co.,* 111 Kan. 46, 49, 205 Pac. 1116; *In re Gorsuch,* 113 Kan. 380, 214 Pac. 794.) If the evidence in this case establishes extreme breaches of the canons, severe penalties would be warranted. We, therefore, turn to consider the specific averments contained in the accusation and the evidence adduced in their support.

It is only fair to say here that while frequent allusions are made herein to Payne, Sr., and Payne, Jr., collectively as "the respondents," by far the majority of charges made in the accusation refer to Payne H. Ratner individually. The latter, in his testimony, assumed full responsibility for setting the policies and guiding the operations of the law firm of Ratner, Mattox and Ratner, in which he was senior partner. The part of Payne, Jr., in implementing the Legal Aid Plan in the Ratner office appears to have been relatively insignificant.

As analyzed by our Commissioner, the accusation comprises twelve charges, some of which overlap, or blend into each other. On oral argument of this cause, counsel for accusers roughly grouped the charges, on which they depended, into the following headings: (1) Solicitation of employment; (2) stirring up and breeding litigation; (3) division of fees with a lay agency, namely the Brotherhood of Railroad Trainmen; and (4) advancement of living expenses to clients. As they are detailed in the accusation, these are charges of grave dereliction of professional duty which must be considered within the framework of pertinent judicial decisions.

Basic to the issue of solicitation, as it must have appeared when these proceedings were brought, was the participation by the respondents in the Brotherhood's Legal Aid Plan which was designed to assist members of the Brotherhood who had been injured while at work, or the survivors of those who had been killed. Under this plan, officers of the Brotherhood and subordinate lodges advised

injured workmen, or their surviving dependents, to obtain legal advice before they settled their claims for damages against the railroads and recommended certain attorneys, usually one or more of the sixteen regional attorneys selected by the Brotherhood, as being dependable and competent to handle their personal injury or death claims.

The operation of this plan, which channeled considerable litigation to lawyers approved by the Brotherhood, appeared to many members of the Bar to constitute solicitation of legal business in violation of the canons of legal ethics which prohibit such practice. About the same time that respondents' activities were being investigated and this action was being prepared for filing, a number of actions were commenced in other states questioning the ethics involved in the Brotherhood's plan. No comment is required as to those cases other than to say they reflected grave concern on the part of many members of the Bar as to the propriety of the plan itself and the activities of those lawyers who were engaging in the implementation of the plan.

At this point note must be taken of the landmark case of *Brotherhood of Railroad Trainmen v. Virginia*, 377 U. S. 1, 84 S. Ct. 1113, 12 L. Ed. 2d 89. This was an action brought by the Virginia State Bar against the Brotherhood of Railroad Trainmen, an investigator employed by the Brotherhood, and an attorney designated its regional counsel, to enjoin them from carrying on activities which the Bar charged constituted the solicitation of legal business and the unauthorized practice of law. The judgment of the Virginia Court granting the injunction was reversed, on appeal, by the United States Supreme Court which held:

"We hold that the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who are injured to obtain legal advice and for recommending specific lawyers. Since the part of the decree to which the Brotherhood objects infringes those rights, it cannot stand; and to the extent any other part of the decree forbids these activities it too must fall. And, of course, lawyers accepting employment under this constitutionally protected plan have a like protection which the State cannot abridge." (pp. 7, 8.)

This decision was not handed down until April 20, 1964, long after the present proceeding was filed, but it peremptorily removes from our consideration the propriety of the Legal Aid Plan itself, as well as the respondents' acceptance of employment pursuant to that plan. Counsel for the accusers candidly acknowledge that

the Virginia decision has appreciably narrowed the scope of permissible examination in this proceeding.

However, the instant action is not entirely disposed of by the foregoing decision for it is contended that the *modus operandi* of the respondents in the implementation of the Legal Aid Plan has so offended against our code of ethics that drastic action is required. It is this aspect of the case which now compels our examination of the evidence.

Before appraising the testimony and exhibits considered by our Commissioner, a few rules should be acknowledged. The burden of proof in a proceeding of this character is greater than that required in an ordinary civil action. This view prevails generally in this country (7 Am. Jur. 2d., Attorneys at Law, § 67, pp. 89, 90; 105 A. L. R., Anno—Attorney's Misconduct—Degree of Proof, p. 984, *et seq.*), and has been followed in Kansas. This court, in *In re Smith*, 73 Kan. 743, 85 Pac. 584, has said:

". . . Although the proceeding is not criminal, it is of such a nature, and the judgment of disbarment is so severe and so direful in its results to an attorney, that something more than a mere preponderance of proof is necessary. A judgment deprives an attorney of an office, of a means of livelihood, and to a great extent of his good name, and should only be rendered upon clear and satisfactory legal proof. . . ." (pp. 753, 754.) (See also *In re Elliott*, 73 Kan. 151, 84 Pac. 750.)

Although the Commissioner's findings are not binding on this court, being advisory only, they are nonetheless, as we said in *Little v. Allen*, 149 Kan. 414, 415, 87 P. 2d 510, "persuasive." In 7 C. J. S., Attorney and Client, § 37b, p. 805, the rule is stated:

". . . However, the report and recommendations of a referee or committee, after an investigation, carry weighty presumptions of justice and propriety, and while the findings of a referee are not conclusive, they will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where they are not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony."

Where relevant, material evidence is within the control of a litigant, whose interest would naturally be served by its production, his unexplained failure to produce it permits an inference that it would be unfavorable to him. (20 Am. Jur., Evidence, § 183, pp. 188, 189, 190.) This is the rule pronounced in *Fowler v. Enzenperger*, 77 Kan. 406, 94 Pac. 995, in which the court held:

"As a general rule the omission by a party to produce important testimony relating to a fact of which he has knowledge and which is peculiarly within

his own reach and control raises the presumption, open to explanation, of course, that the testimony, if produced, would be unfavorable to him." (Syl. ¶ 5.)

We now direct our attention to the specific complaints in the accusation. Since charges of solicitation and stirring up litigation cover much the same grounds, they will be considered together. It is said that the respondents solicited and stirred up business for themselves in three ways: First, by contacting prospective clients, either personally or through agents or through officers and members of the Brotherhood's lodges; second, by circularizing reprints of speeches and articles and sending newsletters to subordinate lodges and their officers; and third, by means of speeches, talks, and social events at Brotherhood conventions and seminars.

The accusation lists thirty-three specific instances of direct solicitation. Of this number, it is alleged that five prospective clients were first contacted by one or the other respondent; that two were accosted by respondents' investigators; that six were visited by one or the other respondent in company of other parties; that five were first contacted by other parties and then seen by respondents; and that fifteen possible clients were contacted not by the respondents but by other individuals, usually union officers and members. Examination of the record discloses that the accusers introduced no evidence to support nineteen of the alleged incidents, and abstracted evidence only as to eight of the remainder. However, we have considered all the evidence properly adduced before the Commissioner, despite the fact that not all was abstracted.

It is entirely unpractical to detail the mass of evidence relating to the alleged incidents of direct solicitation, nor is such deemed necessary. There is no doubt that Brotherhood officers and members did urge their injured brothers, and the survivors of those who had died, to seek legal advice before settling any claims and that they also recommended the Ratners. In so doing, they may have displayed greater vigor, employed more lavish language and made broader representations than was prudent or justified, or than members of the legal profession would approve, but nowhere does it appear that either one of the respondents directed, suggested or encouraged any extravagant activity on their own behalf. The recommendation of regional counsel to union members and their dependents was apparently a common practice and one contemplated by the Legal Aid Plan. Invariably the witnesses, who said they had recommended either of the Ratners, denied they had been

asked to do so or had been promised or paid any consideration therefor.

With but a single exception the credible evidence discloses that initial contacts with possible claimants were made, not by the Ratners themselves, but by individuals who either knew them or knew of them as attorneys or as regional counsel. The evidence is persuasive that both respondents were quite meticulous in refusing to visit with or to contact injured trainmen, or their dependents, until they had been requested to do so.

The one exception relates to a chance encounter at a hospital where Payne H. Ratner had gone to confer with a client. Mr. Ratner was in his client's room alone, when another patient came in to visit. In introducing himself, Mr. Ratner handed the visitor his professional card and, in the course of conversation, said that if he could ever be of service, to call on him. This may verge on solicitation, and hence may not be approved, but it can hardly be said to constitute a serious breach of ethics.

Among the incidents included in the charges of solicitation and maintenance is one alleging the encroachment by Payne, Sr., upon the employment of a fellow attorney. We would never, of course, condone behavior of this kind. The evidence is clear, however, that Mr. Ratner visited the client at her express request and was employed by her during his visit. Whatever misunderstanding arose over the employment of counsel, we believe is shown to have been the result of the client's own lack of frankness with both the lawyers involved. Mr. Ratner's subsequent withdrawal, after being paid for services he had already rendered, was an honorable conclusion of a conflict which in all honesty can hardly be attributed to him. The Commissioner's finding absolving him of blameworthy conduct in this instance is well-founded.

Some of respondents' visits with injured workmen are criticized as being premature and conducted while the injured persons were not fully competent. It may not be inappropriate for us to remark here that instances of this character undoubtedly do occur and that they are reprehensible. But we fail to find convincing evidence in this record that either respondent knowingly took advantage of anyone not fully possessed of his mental faculties.

In the most questionable case, the injured party, a Mr. Mansell, was doubtless under some medication when Payne, Sr., visited him, and his doctor testified he was in no condition to make a contract. However, the doctor also testified that Mansell was competent to

break a contract. Other evidence showed that when Mr. Ratner arrived at the hospital Mansell was in the hall playing cards with another patient, said he was glad to see Mr. Ratner, spoke rationally, asked Ratner to step into another room where they could talk, and appeared to be normal. The Commissioner was in a position to observe the witnesses and judge their credibility, and we are not disposed to disturb his finding that Mr. Mansell was not wrongfully solicited.

Counsel say that no weight was given the evidence of Payne H. Ratner, Jr., concerning the execution of an employment contract with a Mr. Clark. We have examined the evidence which pertains to that incident. It shows that Payne, Jr., upon being informed Clark wished to employ him, reluctantly handed an unsigned contract to Mr. Wilkinson, a member of the Brotherhood, to take to Clark and to return. It is unnecessary to detail all the surrounding circumstances except to say they showed much in extenuation. It is unfortunate that the incident occurred, and that Payne, Jr., did not persist in his first refusal to give Wilkinson the contract. Nevertheless, the incident was not the brazen attempt at solicitation which counsel has pictured.

We concur in the view that solicitation of legal business or engagement in "ambulance chasing," as it is sometimes termed, impairs the reputation of the Bar, hampers the due and effective administration of justice, and is rightly prohibited by the canons of professional ethics. However, in the absence of precise definition of what constitutes solicitation, each case must be judged on its own merits. Obviously, some practices are more reprehensible than others and are clearly proscribed, while other practices are not so plainly prohibited. After combing this record, we are unable to say there is clear and convincing evidence of personal solicitation on the part of either respondent, or that either of them employed or put in motion runners, touters, or other agents to bring them clients.

It is true that two investigators were employed by the Ratner firm on separate occasions, but there is no evidence that either was employed to solicit business, or that either of them contacted prospective clients. On the contrary, the evidence is that their investigations were conducted only after the respondents had been retained. It has been held that the employment of investigators is not unethical under such circumstances and gives rise to no inference that the attorney involved is engaged in "ambulance chasing." (*In*

*re Heirich,* 10 Ill. 2d 357, 387, 140 N. E. 2d 825, 67 A. L. R. 2d 827.)

As previously indicated, members and officers of the Brotherhood and its constituent lodges have praised the legal prowess of the respondents and have highly recommended them. There is nothing essentially wrong in this unless their motivation was provided by the respondents. We are not sufficiently naive to doubt that much legal business flows into an attorney's office because he has been recommended by friends or by clients he has successfully served. The individuals accused of touting for the respondents have denied, many of them indignantly, that they were ever importuned by the respondents to sing their praises, or that they ever expected to profit in any way by so doing. Their zeal seems to have arisen from a genuine interest in their fellow workers, not in respondents' legal practice.

Much of the evidence introduced by the accusers was originally furnished by railroad claim agents and investigators. There is much in the record to indicate they were unfriendly, if not actively hostile, to the respondents. Some of the witnesses procured through their efforts appeared distinctly hostile to respondents and, in some instances, unreliable. No doubt these factors weighed heavily with the Commissioner in his evaluation of the evidence. On the whole, we believe his findings on the issue of solicitation are not open to serious complaint.

The charge of solicitation by means of pamphlets, circulars and newsletters, stems from these facts: The Ratner firm ordered, in sizeable quantity, copies of a talk given by S. C. Lush at a convention of the Brotherhood of Railroad Trainmen, and an article by T. C. Carroll, president of the Brotherhood of Maintenance of Way Employees. The Lush speech emphasized the importance of legal aid, while Carroll's article stressed the importance to injured workmen of obtaining legal advice from competent attorneys. Neither speech, nor article, mentioned or referred in any manner to either respondent.

According to Payne, Sr., some 80 or 90 percent of the copies of the Lush speech were never distributed, but some copies were given to clients and others were furnished to local lodge officers who wished to make them available to their membership. Copies of the Carroll article were likewise given clients after they had employed the Ratner firm, many were supplied to lodge officials who wanted them for their members, and several thousand were sent to officers of the Brotherhood of Maintenance of Way Employees

for distribution at conventions and meetings in Kansas and other states.

We have been furnished no more precise definition of what constitutes advertising than we have been given for solicitation. The American Bar Association Committee on Legal Ethics has interpreted Canon 27 on a case by case basis, no one of which parallels the case before us. Authoritative guideposts which might provide concrete directions are lacking. We are inclined to the view, however, that the acts shown do not amount to flagrant infractions of Canon 27, or descend to the level of self-advertisement.

We have not overlooked the proffer of the testimony of Payne H. Ratner's former private legal secretary. The Commissioner excluded her evidence on the ground it pertained to privileged communications and thus was barred by statute (G. S. 1949, 60-2805, *Fourth* [now K. S. A. 60-426]). This ruling is vigorously assailed as error, but we believe the point needs no extended discussion. We have examined the proffered evidence and have reached the conclusion that it would not have materially affected or substantially altered the case presented.

Although we are not now disposed to brand the distribution of the Lush talk and the Carroll article as sufficient cause to impose the drastic penalty of disbarment, we do suggest that the best traditions of our profession could more properly be served by leaving such projects to officers and lay members of the Brotherhood than by counsel themselves undertaking them. Especially would this be so if distribution be made, using the firm's envelopes, to union officers and members at large. Repetition of such a practice should scrupulously be avoided in the future.

The newsletters, by means of which respondents are alleged to have advertised their wares, were sent to the officers of union clients represented by their firm. Several of the letters are in evidence. They contain no reference to any cases handled by the respondents. Their contents are confined to rulings of boards, commissions and courts on problems of interest to union labor, together with proposed and completed legislation important to the Brotherhood, and other items which might affect unions and their members. The respondents cite Opinion 213 of the Committee of Professional Ethics and Grievances as permitting such practice. After studying this opinion, we agree that sending of newsletters of the above type to regular clients does not offend Canon 27.

Any charge that respondents have extolled their legal virtues and

accomplishments in speeches at conventions and seminars is not borne out by the evidence. While appearances were made at labor meetings—social, business and educational—and talks were given, especially by Payne, Sr., there is naught in the record to show that respondents sang their own praises or engaged in immodest behavior. The good taste of giving a cocktail party at one convention might be questioned but there is no evidence that even this particular incident was used for self-aggrandizement.

The facts concerning the charge of "fee splitting" with the Brotherhood are not seriously in dispute. In 1954, when Payne H. Ratner was appointed regional counsel, the expenses of the Legal Aid Department were divided among and paid by the several regional counsel throughout the country. The exact basis on which the allocations were made is not clear from the evidence. Since the sums varied widely from year to year—the respondents' share ranging from $421.80 in 1955 to $2,571.15 in 1957—it may be reasonable to assume that some relationship existed between the allocation of costs and the volume of legal business handled by each regional counsel.

According to the respondents' testimony, payment of department expenses by legal counsel was made in return for services rendered. The legal department provided detailed reports concerning their clients' accidents. It also furnished statistics on railroad accidents generally, and their causes; safety rules of railroad companies; reports of accidents made by the companies to the Interstate Commerce Commission; and practical advice from the department heads who had been railroad men and thus were conversant with railroad practices, equipment, terminology and working conditions.

In 1958, the Illinois Supreme Court handed down a decision in *In re Brotherhood of R. R. Trainmen*, 13 Ill. 2d 391, 150 N. E. 2d 163. This action had been brought by the Brotherhood seeking a declaratory judgment and requesting a ruling that certain practices in which the Brotherhood engaged were neither illegal nor unprofessional. In its opinion, the Illinois court said:

". . . No financial connection of any kind between the Brotherhood and any lawyer is permissible. No lawyer can properly pay any amount whatsoever to the Brotherhood or any of its departments, officers or members as compensation, reimbursement of expenses or gratuity in connection with the procurement of a case." (p. 398.)

Pursuant to this opinion, the respondents have paid no assessment for any year subsequent to 1958. Thus, two years in which no pay-

ments were made by the Ratners had elapsed before the Wichita Bar Association even lodged its complaint against them with the Board of Law Examiners, and three years had gone by without payments before the Board instituted these disbarment proceedings. Now, in the year 1965, it has been six years since the respondents have made any contributions toward the expenses of the Legal Aid Department. Incidentally, this department, we understand, has been abolished.

We believe that regardless of any improprieties which may have inhered in the respondents' payments to the Legal Aid Department, the charge is now somewhat stale, especially since payments were discontinued after the Illinois decision came down. Prior to that decision there had been no authoritative condemnation of the precise method used in financing the Legal Aid Department, and the respondents' prompt acquiescence in the court's judgment negatives culpable intent on their part.

Although no statute of limitations is applicable to actions seeking disbarment, this court has recognized that charges may become so stale that it would be inequitable to act upon them. (*In re Elliott*, 73 Kan. 151, 84 Pac. 750.) While the charges under consideration in the Elliott case were somewhat older than the fee-splitting charge here, the principle announced in that case would seem equally applicable to the present circumstances.

The fourth general charge accuses the respondents of maintenance through the medium of providing loans to prospective clients. In this connection, the accusers have produced no evidence that either respondent advanced or loaned any money to a prospective client, or that they ever promised to make loans in order to secure clients. One former client did testify that Payne, Sr., promised to help him arrange a loan provided the client would not break an existing contract of employment. However, his testimony was sharply disputed, and there was much in the evidence which cast doubt on his credibility. Our Commissioner found him to be unworthy of belief, and we cannot disagree with that assessment.

The evidence does show that in some instances Payne H. Ratner was able to help needy clients obtain small loans from the Wichita State Bank, of which he was a director. These loans were made on straight promissory notes signed by the clients and payment was not contingent on their recovery of damages. Despite the fact that Mr. Ratner guaranteed payment, he was not primarily liable on the notes and he was never called upon to pay a single note, or any

interest thereon. All loans were fully paid by the respective makers.

Maintenance has been defined as ". . . an officious intermeddling in a suit which in no way belongs to the intermeddler by maintaining or assisting either party to the action, with money or otherwise, to prosecute or defend it. . . ." (14 Am. Jur. 2d, Champerty and Maintenance, § 2, p. 843.) In *Jahn v. Champagne Lumber Co.*, 157 Fed. 407, the court had this to say about maintenance:

"It has never been held violative of law or public policy to give financial aid to a poor suitor who is prosecuting a meritorious cause of action. In the absence of any bargain to share the recovery, no just criticism can attach to one offering such friendly aid. . . . The law does not tolerate the notion that a powerful defendant may force the abandonment of a suit whenever he is able to exhaust the slender means of a weak antagonist. . . ." (p. 418.)

We hardly think that what was occasionally done by Payne H. Ratner to assist clients in obtaining needed funds to tide them over can be said to fit in the category of maintenance. One of the accusers' counsel, when queried by the Commissioner on the subject, replied that the accusers did not contend there would be anything wrong in loaning a client money so he could live until his case was tried and could get what he was entitled to rather than having to settle for much less. But he did state it would be wrong for a lawyer to set up a scheme and advertise that he would lend money to clients who came to him.

We agree with counsel's last statement, but there is no evidence of any such a scheme in this case. There is no evidence that the respondents either advertised, or authorized anyone to state on their behalf, that loans would be secured for their clients.

It is suggested, however, that the mere bulk or number of cases in which bank loans were secured for Ratner clients creates an inference that such a scheme was in effect and that it was known by prospective clients. To buttress this claim, the accusers point out that subsistence loans were made to 67 of 312 railroad accident claimants. However, the number of railroad accident claims handled by the Ratner firm was indeed small compared to the total volume of their legal business. The number of clients obtaining loans is not impressive when compared to more than 8600 items handled during the period involved. Furthermore, we believe a dangerous precedent might be set were disbarment of a lawyer to be based on an inference so tenuous.

The accusers refer to Canon 10 of the Professional Ethics providing that a lawyer should not purchase an interest in litigation which he is conducting. We cannot agree that this canon was violated. Payment of the promissory notes signed by the clients was not made contingent on any recovery by them on their claims.

We are aware of Canon 42 which provides in substance that a lawyer may not agree with a client to bear the expenses of litigation, but may in good faith advance expenses as a matter of convenience, but subject to reimbursement. We are cognizant also of Opinion 288 which, in essence, construes expenses to mean those which result from the conduct of the litigation itself, such as court costs, witness fees, and the like. We believe a careful reading of the opinion indicates it was not intended to cover a situation like the one here, for the opinion states:

"For a lawyer to advance such living costs *is similar to making an advance on account of the prospective verdict. Clearly there is no expectation of reimbursement except out of the verdict.* Accordingly, a lawyer who makes such advances acquires thereby an interest in the subject matter of the litigation which he is conducting, in violation of *Canon 10.* . . ." (Emphasis supplied.)

As we have said, the loans in this case were made by a bank and constituted valid legal obligations of the respective makers. Liability was absolute, not contingent on the successful prosecution of the makers' claims. These factors, we believe, distinguish this case from the situation envisioned in Opinion 288.

We would also call attention to the statement made by Mr. Henry S. Drinker in his work on Legal Ethics, where on page 95, he says: ". . . He [a lawyer] may loan money to a client but not as a regular practice. . . ." Since help in securing loans was provided in but a minute fraction of the total cases handled by respondents, we cannot say it constituted a regular practice.

Among the specific unethical actions charged in these proceedings are statements attributed to Payne H. Ratner in connection with the dismissal of an Oklahoma suit filed against the respondents and the filing by them of an action in Shawnee County, Kansas, against the Board of Bar Examiners and others for an injunction. We have examined the transcribed record relating to these incidents even though the accusers do not now press their allegations in regard thereto.

There is no substantial evidence proving that Payne, Sr., contacted newsmen to publicize either the dismissal of the Oklahoma

suit or the filing of the Kansas action. Reporters may have sought him out on both occasions but he himself is not shown to have instigated the interviews. He declined to comment directly on the Kansas case, and the news release as to the Oklahoma lawsuit was properly excluded on the ground of hearsay. Even so, the latter did not appear unduly offensive.

We would agree, and indeed it was conceded by Payne H. Ratner himself, who alone appears responsible, that some unfortunate and indiscreet language was used in the pleadings filed in the Kansas action, and we would expect such language not to be repeated. But, we also have some understanding of human frailty and realize that provocation may lead to action later repented. While the use of the offensive wording is regrettable, it is understandable, and we do not consider it sufficiently malignant to justify revocation of respondents' right to practice law.

Included in the transcript of the evidence is an impressive array of affidavits attesting to the character of the two respondents. Those relating to Payne, Sr., number well over one hundred, while those on behalf of Payne, Jr., exceed two hundred. Encompassed is the testimony of reputable and eminent members of both the bench and bar of Kansas, lawyers from other states, businessmen, doctors, clergymen, editors, educators and others. Many of those who have attested to the good repute of the respondents have held high and responsible public office and many have been prominent in the civic, business and cultural life of the state and their home communities.

We are mindful that evidence of good character and reputation is not sufficient to overcome evidence which establishes specific charges, especially where those charges involve criminality or moral turpitude. However, where accusations do not import venality, as is true in this case, or where there is conflicting evidence, which is also true here, the testimony of responsible citizens as to the reputation and character of the accused may not be wholly ignored. Evidence of such a character is entitled to consideration and must be given weight (*In re Heirich,* supra; *In re Mason,* [Mo. Ct. App.] 203 S. W. 2d 750.)

What is said in this opinion must not be interpreted as condoning the violation of the Canons of Professional Ethics. Those canons have long set the standards for ethical legal conduct and whoever assumes that this court countenances serious, willful infractions of

those standards, when such have been legally established, wholly misconstrues our intent. The practice of "ambulance chasing," by which we mean the active personal pursuit of legal business, or the solicitation of professional employment through runners, touters, or any persons acting at the behest of an attorney, is repugnant to all reputable and conscientious members of the Bar, and we join in that consensus.

Our opinion, like that of our Commissioner, goes merely to this extent: That the credible evidence fails to furnish that clear and convincing proof of substantial misconduct required in proceedings of this nature. In so saying, we do not put our stamp of approval on practices which are shoddy or questionable, even though they may not violate the letter of the law or of the canons.

Neither do we uphold the activity of claim adjusters in interviewing claimants behind the backs of their lawyers, as seems to have been done in this case. The practice of obtaining statements in the absence of known counsel is obnoxious and efforts to effect the discharge of counsel already employed are inexcusable.

Our Commissioner has found that in bringing this proceeding, the State Board of Law Examiners was not acting maliciously. In this finding, we concur. When the accusation was filed, the United States Supreme Court had not handed down its decision in *Brotherhood of Railroad Trainmen v. Virginia,* supra, and the ethical aspects of the Brotherhood's legal aid program were under extensive investigation. In our judgment, no improper motive may be imputed to the Board in adopting its resolution directing this action be filed, or to the attorney general in following the Board's directions.

This opinion has of necessity been lengthy, for the record is voluminous, the transcript and exhibits exceeding five thousand pages in all. We have attempted to cover the major aspects of the case, realizing that the problems presented are of general concern to members of the legal profession, as well as of vital importance to those directly involved.

In concluding, we hold that the findings and conclusions of our Commissioner were providently made. We concur in his conclusion that the respondents should be discharged, and it is so ordered.