No. 45,160

In the Matter of the Accusation for Disbarment of
FRED W. PHELPS

(459 P. 2d 172)

Opinion filed September 24, 1969.

*Richard H. Seaton,* assistant attorney general, argued the cause, and *Kent Frizzell,* attorney general, was with him on the brief for the accusers.

*Robert E. Tilton,* of Topeka, argued the cause, and was on the brief for the accused.

The opinion of the court was delivered by

O'CONNOR, J.: Under the provisions of K. S. A. 7-111, *et seq.,* the State Board of Law Examiners instituted this disbarment proceeding September 14, 1967, against Fred W. Phelps, a practicing attorney in Topeka.

The original accusation of disbarment contained seven counts of alleged professional misconduct. Phelps answered, and issues were joined. Thereupon, this court appointed the Honorable George K. Melvin as its commissioner, who proceeded to hear evidence and to render his report. The commissioner generally concluded that the board had failed to sustain the burden of proving the allegations of any of the seven counts. The board then filed its exceptions to that portion of the commissioner's report pertaining to Counts I, III, IV and V and renewed its request for disbarment of Phelps as originally prayed for in the accusation. Phelps, on the other hand, has filed a motion to accept the commissioner's report, and for his discharge.

Notwithstanding the commissioner's findings and conclusions, it now becomes our duty to examine the record pertaining to the four counts to which exception has been taken, and after doing so, determine for ourselves the judgment to be rendered. (*In re Stice,* 184 Kan. 589, 339 P. 2d 29.)

At the outset we should make clear that disposition of this case is being made under applicable law and rules existing prior to the

enactment of chapter 303 by the 1968 session of the legislature and the promulgation of Rules 201 through 211 by this court (effective May 21, 1968).

In a proceeding of this character the burden of proof is greater than in an ordinary civil action, and to sustain the burden requires clear and satisfactory proof of facts warranting disciplinary action. (*In re Ratner*, 194 Kan. 362, 399 P. 2d 865.) The findings and report of the commissioner are advisory only and not binding on this court (*In re Cox*, 164 Kan. 160, 188 P. 2d 652); nevertheless, his findings are persuasive (*In re Ratner*, supra).

Under the statute (K. S. A. 7-111) an attorney may be disbarred or suspended for the grounds enumerated, which include willful violation of his oath or of any duty imposed upon him as an attorney at law. The bases for revocation or suspension of an attorney's license to practice, however, are not restricted to those of the statute. Serious infractions of the Canons of Professional Ethics adopted by the American Bar Association are also grounds for invoking disciplinary measures against offending lawyers. We have said that this court has inherent authority to discipline members of the bar of this state whenever their conduct substantially fails to conform to the ethical standards prescribed for the legal profession, or whenever their activities become otherwise inimical to the just and orderly administration of law. (*In re Ratner*, supra, and cases cited therein.)

Count I of the accusation pertains to Phelps' activities in October-December 1966, while serving as court-appointed counsel for one Samuel R. Kanive, who was then confined in the Shawnee county jail on a criminal charge. The allegation is that in his fiduciary capacity as Kanive's attorney Phelps received from Mrs. Mary Bowman (Kanive's former wife) the sum of $200 to be used solely for the purpose of paying the premium on an appearance bond so that Kanive could be released from jail pending trial; and that instead of purchasing the bond, Phelps retained the money so entrusted to him.

In support of the charge, testimony was given by Mrs. Bowman, her mother and Norris Peterson (a bondsman). Following Kanive's incarceration, he requested Mrs. Bowman to get $200 for a bond premium and contact Phelps, his attorney. In compliance with the request Mrs. Bowman talked to Phelps, who agreed to secure Kanive's release upon Mrs. Bowman's obtaining the money and bringing it to him. Since she was without funds, her mother raised

the money and paid the $200 to Phelps' wife, who gave her a receipt for the same. Several days later Mrs. Bowman talked to Phelps and asked him to secure a divorce for her from her then husband, Frank Bowman. Phelps agreed, provided he receive an additional $48, he having been paid two dollars in cash by Mrs. Bowman and her mother. The $48 was furnished by Mrs. Bowman's mother and paid to Phelps' wife.

At the time Phelps entered the case a petition for divorce was already on file. On December 1, 1966, Mrs. Bowman was granted a default divorce from Bowman in Shawnee county district court. Upon inquiry by the judge, Phelps replied his fee has been paid. The journal entry prepared by Phelps recites that Mrs. Bowman "has paid her attorney's fees in full in amount of $250." There was testimony by the bondsman that Mrs. Bowman told him she had raised the money for Kanive's bond and had given it to Phelps. The bondsman, after several attempts, was unable to get in touch with Phelps by telephone; however, he did see him on one occasion at the courthouse, where Phelps told the bondsman he would be in touch with him. The bondsman heard nothing further except from Mrs. Bowman, who was quite upset because her former husband was not out of jail.

After the divorce Mrs. Bowman attempted to reach Phelps by telephone on numerous occasions regarding Kanive's release, but was always informed Phelps was not in. Phelps did not use any of the money to purchase a recognizance for Kanive. In fact, Kanive remained in jail and was eventually convicted of a felony and sent to the Kansas Reception and Diagnostic Center.

Although neither Mrs. Bowman nor her mother ever gave Phelps permission to apply the $200 to the divorce fee, neither did they demand that he return the money earmarked for Kanive's bond. Both testified it was satisfactory with them if the money was applied by Phelps on the divorce fee.

Phelps testified the $250 paid him was for the divorce fee, and specifically denied he was ever given any money to secure a bond for Kanive. According to Phelps, Mrs. Bowman was interested in getting a divorce so she could remarry Kanive, and since Phelps was also a minister, he told her he would perform the marriage ceremony free of charge in the county jail after the statutory waiting period.

After hearing the evidence on Count I, the commissioner found there was no necessity to resolve the conflict in the testimony, for the reason both Mrs. Bowman and her mother expressed satisfac-

tion with the money being applied to the divorce fee. The commissioner concluded nothing unethical on Phelps' part had been shown.

The commissioner's refusal to resolve the factual dispute was based on what we believe to be an erroneous premise. When an attorney has engaged in unethical acts or conduct detrimental to the best interests of the profession, it is no defense in a disciplinary proceeding that his client or others directly affected have not complained or have acquiesced in such conduct. (See, *In re Thompson,* 30 Ill. 2d 560, 198 N. E. 2d 337; *Memphis & Shelby County Bar Assn. v. Sanderson,* 52 Tenn. App. 684, 378 S. W. 2d 173.) Neither does the principle of ratification have any application to immunize the attorney from disciplinary action in an appropriate case. (See, *People v. Hillyer,* 88 Colo. 428, 297 Pac. 1004.) Were the rule otherwise, any attorney could, with impunity, conduct himself in complete disregard of the ethical standards of the legal profession so long as his client was ultimately satisfied. A client's consent cannot shelter the attorney from unprofessional conduct. The courts owe a duty to themselves, to the public, and to the profession to see that the conduct of lawyers is maintained at the highest professional level which the temerity and improvidence of clients themselves cannot supersede. Thus, as to Count I, we are compelled to examine and weigh the evidence adduced by both sides, uninfluenced by the commissioner's ultimate conclusion.

After examining the testimony presented, we are convinced the overwhelming weight of the evidence establishes that Phelps obtained from Mrs. Bowman, through her mother, the sum of $200 to be used solely for purchase of a bond to secure the release of Kanive, that Phelps failed to do so and, instead, applied the sum on his fee for representing Mrs. Bowman in her divorce action, without either her permission or that of her mother.

Phelps' conduct with respect to his client Kanive failed, in our opinion, to measure up to the standards required of a lawyer practicing before the courts of this state, and cannot be countenanced. As a part of his professional duty, an attorney appointed as counsel for an indigent prisoner should always exert his best efforts in behalf of his client. (Canon 4 of the Canons of Professional Ethics, 198 Kan. XVII.) In fact, the appointed lawyer's duty to an indigent client is basically the same as that owed to any client. In all cases the attorney must act with the utmost honesty, good faith, fairness, integrity and fidelity, irrespective of his client's ability to pay.

Phelps' failure to apply funds entrusted to him for the express purpose of obtaining Kanive's release from jail constituted a breach of the confidence and trust necessarily existing in every attorney-client relationship. By receiving the money, Phelps had in his hands the means of obtaining Kanive's release, pending trial. Instead, he appropriated the money to his own use and benefit by applying it upon a fee for services rendered to another. This conduct was directly opposed to his client's best interests and welfare, in violation of Canon 4. Moreover, we believe Phelps acted contrary to the spirit, if not the letter, of Canon 11, which provides in substance, that money of a client or collected for a client, or other trust property coming into a lawyer's possession, should not under any circumstances be commingled with his own or be used by him. The money, although entrusted to Phelps to be used for the benefit of his client, was applied by him to an entirely different purpose, without permission of his client or those furnishing the funds. Furthermore, we view Phelps' conduct not only as a violation of his duty to his client, but also a breach of the trust and confidence reposed in him by Mrs. Bowman and her mother. The circumstances disclosed by the evidence indicate that by using the $200 as he did, Phelps was insuring full payment of the divorce fee from Mrs. Bowman, whose financial ability to pay was highly questionable.

As to the three remaining counts, the board makes plain it does not seek to overturn specific findings of fact which are sustained by the evidence, or which are not against the clear weight of the evidence, or which resolve sharp conflicts in the testimony; but, rather, the board takes vigorous exception to several of the commissioner's legal conclusions. We believe there is merit to the board's position.

Turning to Count III of the accusation, we find the allegation being made that Phelps, prior to the time of his admission to the bar (February 12, 1964), prepared a written instrument dated June 1, 1960, purporting to transfer the interest of Raymond M. Davis and his sister in certain real estate to their mother, Edith Davis; that thereafter Raymond Davis filed a voluntary petition in bankruptcy; that Phelps appeared in the bankruptcy proceeding on his own behalf as a creditor of Davis and attempted to have the same real estate included in the bankrupt's estate by asserting the written agreement which he had prepared in 1960 was ineffective.

The evidence at the disbarment proceeding disclosed that Phelps, while engaged in his then occupation as a minister, prepared without charge the agreement as alleged at the request of Edith Davis, one of his parishioners. At that time Raymond Davis was living in New Mexico. The agreement contained signature lines for seven persons. It was signed by Edith Davis, notarized by Phelps, and then mailed by him to Raymond with a request that Raymond and his wife execute the document. Despite repeated requests by Phelps, the document was never returned.

On September 8, 1964, Phelps was awarded a money judgment against Raymond Davis in the city court of Topeka upon a promissory note for money loaned to Davis by Phelps, and damages resulting from default on a car rental agreement. After failing to compromise the matter, Davis filed his bankruptcy petition on or about September 25, 1964. The earlier agreement came to light at the first meeting of creditors when Phelps appeared as a judgment creditor and questioned the document on the basis it had not been duly executed by Davis and his wife, and therefore, the real estate described therein should be included in the bankrupt's estate. In his report to the referee the trustee requested authorization to abandon any alleged interest of Davis in the property. The referee found that the agreement was prepared by Phelps as Davis' attorney, that Davis and his wife had, in fact, executed the agreement, and that "the bankrupt, Raymond Davis, in good faith and under the advice of his then counsel, Fred W. Phelps, believed said instrument to be a valid and effective transfer of whatever interest he may have had at the time he executed the same, in and to the real estate in question and his rights under the contract of purchase," and granted the trustee's request.

Phelps testified in this disbarment proceeding that at no time had he ever acted as an attorney for Davis, nor had he advised him that the agreement was an effective and valid transfer of his interest.

From this evidence the commissioner found there was no impropriety in Phelps appearing as a judgment creditor in the bankruptcy court, and that in order to protect his judgment, he had the right to inquire of Davis concerning the background of the agreement to determine whether or not it had been duly executed and was of full force and effect. Hence, the commissioner concluded no unethical conduct had been shown.

By the terms of the agreement Edith Davis agreed to fully assume all responsibility as buyer under a real estate purchase contract dated August 29, 1955, between Alvin L. and Mary L. Miller (sellers) and Raymond Davis and his sister, Stella M. Davis (buyers). The agreement further provided that Raymond and his sister were releasing to their mother any claim or interest they had in the real property. The record discloses that after the agreement was drawn Edith Davis occupied the premises and made all contract payments on the purchase price.

The only evidence offered in support of the accusation was documentary in form, which included the bankruptcy proceeding referred to above. Despite Phelps' denial he advised Davis or acted as Davis' attorney, or that he testified to that effect in the bankruptcy hearing, the referee's findings would indicate otherwise. Said findings were affirmed by the federal district judge on Phelps' petition for review.

The board makes no complaint about Phelps unlawfully practicing law by preparing the agreement of June 1, 1960, prior to his admission to the bar of this state. Disciplinary action is urged as a result of Phelps' subsequent conduct after becoming a member of the bar. Although the record indicates Phelps' attack on the effectiveness of the agreement in the bankruptcy proceeding as a judgment creditor was apparently on the ground it was not executed by all necessary parties, his conduct in doing so tends to cast a shadow of reproach on the integrity and trust required of the legal profession generally. After all, this was the same instrument which the referee found Phelps prepared as Davis' attorney and advised Davis as to its efficacy. Even if credence is given to Phelps' contention that he neither advised Davis nor acted as his attorney, Phelps' role as counselor-advisor to Edith Davis remains undisputed. Under either version Phelps was acting, initially at least, in the trusted capacity of advisor, or confidant, to Raymond (or Edith) when the agreement was prepared, although at the time he was not admitted to practice as an attorney. His subsequent appearance as a judgment creditor in the bankruptcy proceeding was not as an attorney, but as an individual for his own personal benefit and possible gain. But during the interim he became licensed to practice and, thus, rendered himself subject to the code of conduct required of a member of the legal profession. As an attorney he was required to refrain from any act by which he stood to benefit

personally from a transaction involving a former "client," even though initiated prior to his admission. If, as Phelps urges, he was acting in the first instance for and on behalf of Edith Davis, his later attack in the bankruptcy proceeding on the effectiveness of the agreement was in complete derogation of her best interests and constituted an act of disloyalty to her. Edith had been making payments on the property in accordance with the provisions of the agreement, and if the agreement was not effective, as Phelps alleged in the bankruptcy proceeding, she stood to lose the money she had paid.

An attorney should not attempt to nullify his own work by taking action in a matter for his personal benefit or gain which undermines the confidence and trust earlier reposed in him by a client. (Canon 11.) Yet, in this case the record shows that Phelps' activity in the bankruptcy proceeding was aimed directly at abrogating the very result sought to be attained through the agreement—all for Phelps' personal gain. Phelps' conduct goes beyond the pale of circumspection, and we believe can be viewed only as bringing reproach and dishonor to the legal profession.

With respect to Count IV, the allegations are that on March 30, 1965, Phelps was employed by Mrs. Virginia Acheson to represent her in a divorce action in Shawnee county; that Phelps required Mrs. Acheson to sign a written agreement and pay him a $2500 fee for his services; that she paid him $1000 before discharging him on May 3, 1965; that the following day Phelps filed an attorney's lien in the divorce case for the $1500 balance due under the agreement; that the court subsequently disallowed the lien; that without sending a written statement or demand, Phelps filed an action in the district court of Shawnee county for $1500, although the court, in adjudicating the attorney's lien, found his services to Mrs. Acheson were not worth more than the $1000 he had already received. A further allegation is that shortly after being employed, Phelps advised Mrs. Acheson to deplete her assets for the purpose of securing a larger allowance for temporary support, and that thereafter he withdrew a motion for temporary support without consulting his client.

As to the latter allegation, the commissioner found from the evidence that after Phelps had filed a motion for temporary support he learned Mrs. Acheson had control of approximately $3000 and, therefore, did not present the motion. In regard to the attorney's

lien, the evidence disclosed that on November 29, 1965, the Honorable William R. Carpenter found the services rendered by Phelps were worth no more than $1000, which had already been paid, but further found that Phelps, at the time his services were terminated, "stood ready to render full performance under said agreement." Phelps then filed a separate action against Mrs. Acheson on the written agreement for the remaining $1500, which was determined adversely to Phelps by the district court's sustaining a motion for summary judgment in favor of Mrs. Acheson.

The commissioner concluded, "The only matter which might warrant criticism was the filing of the $1500 suit after the findings made in the divorce case" on the lien, and this "may be classed as harassment." He further suggested Phelps' actions might be subject to "reprimand or censure" and judgment should be rendered as this court deems proper.

The district court, in adjudicating the amount of recovery under the attorney's lien, relied on *Shouse v. Consolidated Flour Mills Co.,* 132 Kan. 108, 294 Pac. 657, wherein it is stated:

". . . where the contract of employment is for a stipulated fee but their [the attorneys'] services are dispensed with before the conclusion of the litigation or other professional work for which they were engaged, the client is bound to pay what the services performed are reasonably worth." (Syl. ¶ 3.)

The court not only determined the reasonable value of Phelps' services were in the amount of $1000, but also found the total value of the property involved in the divorce action was $26,000 to $30,000, and the agreed fee of $2500 was unreasonable under the circumstances as they existed at the time the contract of employment was entered into.

Phelps, instead of appealing from the decision of the district court, filed an indepedent lawsuit against Mrs. Acheson in the *same* court on the *same* contract for the *same* amount. We agree with the commissioner's conclusion that this constituted harassment. Phelps now seeks to placate the course followed by saying that defending a separate action would be less expensive to Mrs. Acheson than had he forced her to come to this court on an appeal. Such argument bears little weight when in the same breath Phelps admits in his brief the separate action was determined adversely to him in the district court and he has now appealed that decision to the supreme court. We make no attempt to prejudge the merits of that appeal on the question of *res judicata* or collateral estoppel; neither are

we compelled to determine whether there was good and sufficient cause for Mrs. Acheson to discharge Phelps as her attorney and terminate their relationship. Certainly a client, when dissatisfied with the services of an attorney, may discharge him, and under the view expressed in *Shouse v. Consolidated Flour Mills Co.,* supra, is liable for the reasonable value of services rendered to the date of dicharge. (Also, see, 7 Am. Jur. 2d, Attorneys at Law § 255; 7 C. J. S., Attorney and Client §§ 109, 168 and 169.)

An additional circumstance not to be overlooked is the specific finding of the district court that the fee contracted of $2500 was unreasonable. While ordinarily the fixing of fees for professional services is a matter of agreement between the attorney and his client, and courts will not interfere, nevertheless, courts will not enforce the contract of employment where the fee charged is unreasonable under the facts and circumstances presented. (*Grayson v. Pyles,* 184 Kan. 116, 334 P. 2d 341.)

We believe that under all the circumstances Phelps' entire course of conduct with respect to his fee in the Acheson matter demonstrates a lack of professional self-restraint in matters of compensation. The filing of the separate action against Mrs. Acheson, after an adverse decision in the attorney's lien proceeding, can only be interpreted as an oppressive act designed to unjustly harass his former client. Lawsuits concerning attorney's fees are discouraged by Canon 14, which provides:

> "Controversies with clients concerning compensation are to be avoided by the lawyer so far as shall be compatible with his self-respect and with his right to receive reasonable recompense for his services; and lawsuits with clients should be resorted to only to prevent injustice, imposition or fraud."

Lastly, in Count V of the accusation the allegations are made that in March 1964 Phelps was retained by John E. Jacobson on a contingency basis to represent him in case No. 93686 in the district court of Shawnee county in which Jacobson was suing Ford Motor Company, Mosby-Mack Motor Company and Noller Motors; that Phelps agreed to do all things necessary to represent Jacobson's interests, and Jacobson agreed to pay Phelps 50 percent of any recovery for his services; that subsequently, when Jacobson refused to settle his claim with Ford Motor Company, as Phelps had advised him to do, Phelps refused to perform additional work on the case pursuant to his contract of employment and, instead, demanded that Jacobson reimburse him for his further services without regard to any recovery against the company.

Only a brief summary of the voluminous testimony and record on this count will be attempted.

The parties stipulated the attorney-client agreement between Phelps and Jacobson was oral. The commissioner found that under the terms of the employment agreement Phelps was retained on a contingent fee basis and Jacobson agreed to pay him 50 percent of any recovery as a fee for his services. Pursuant to the agreement Phelps performed legal services for and on behalf of Jacobson. When Phelps undertook the representation of Jacobson he filed a written notice of his employment, along with an attached affidavit executed by Jacobson, which stated Phelps was empowered with full authority to "prosecute, negotiate, settle, and in any and all ways handle the litigation."

Phelps secured a settlement of $10,000 in the case from defendants Mosby-Mack and Noller Motors, out of which he received $5,000 under the terms of the contingent fee agreement. Thereafter, he obtained an offer of settlement in the amount of $15,000 from Ford Motor Company, the remaining defendant, but Jacobson refused the offer. As a result of Jacobson's refusal, Phelps informed Jacobson if he insisted on going to trial, he would have to pay Phelps a $1500 fee in advance, which would be deducted from the one-half due Phelps in the event Jacobson prevailed. Phelps also demanded an advance of $1000 toward expenses for trial. Jacobson countered with a letter revoking any power or authority Phelps had to settle the case, stating his version of their contingent fee contract, refused to pay the $1500 and $1000 requested, insisted Phelps go forward with the trial, and demanded an accounting for $5800 expense money previously advanced to Phelps.

At this point an impasse was reached in the attorney-client relationship, and Jacobson immediately sought assistance from the grievance committee of the Topeka Bar Association. The commissioner found from the disputed evidence that Jacobson in fact wanted Phelps to use the $5000 received by him as a contingent fee in the Mosby-Mack-Noller Motors settlement for further litigation expenses in the case. Jacobson retained another law firm to represent him in his dispute with Phelps, and his new attorneys prepared a written agreement of compromise and release settling all disputes between Jacobson, his wife, and Phelps, which agreement was duly executed by the parties.

Thereafter, the lawsuit against Ford Motor Company was tried, Jacobson being represented by his new attorneys, and a verdict rendered for the company. The judgment pursuant to said verdict was subsequently upheld on appeal to this court. (See, *Jacobson v. Ford Motor Co.*, 199 Kan. 64, 427 P. 2d 621.) The commissioner concluded that Phelps' conduct as legal representative of Jacobson was entirely proper under all the circumstances.

We have considerable difficulty in determining from the record just what the employment contract between Jacobson and Phelps provided with respect to litigation expenses. Apparently the parties had operated on the assumption such expenses were to be paid by Jacobson. The board's principal complaint deals with Phelps' failure to account to his client for expense money advanced in the case. This, however, was accomplished as a part of the compromise agreement entered into after Jacobson obtained new counsel. Although Phelps' refusal to complete the contingent fee contract without extra "guaranteed" compensation can scarcely be justified on a legal basis, such refusal, in our opinion, does not warrant the charge of professional misconduct. Breach of the contract may have affected Phelps' right to full compensation for services performed had Jacobson recovered, and even rendered him liable for damages. (See, *Moore v. Fellner*, 50 Cal. 2d 330, 325 P. 2d 857.) On the other hand, because of the weakness of Jacobson's case against Ford Motor Company, Phelps' advice to accept the settlement offer of $15,000 demonstrates an element of good faith on his part and eliminates the unethical connotation sought to be inferred by the accusation. Under all the circumstances, the conclusion of the commissioner as to Count V is adopted.

Phelps, like all lawyers when admitted to practice before this court, agreed to be bound by the attorney's oath, which reads as follows:

"You do solemnly swear that you will support and bear true allegiance to the constitution of the United States and the constitution of the State of Kansas; that you will neither delay nor deny any man his right through malice, for lucre, or from any unworthy desire; that you will not knowingly foster or promote, or give your assent to any fraudulent, groundless or unjust suit; that you will neither do, nor consent to the doing of any falsehood in court; and that you will discharge your duties as an attorney and counselor of the supreme court and all inferior courts of the state of Kansas with fidelity both to the court and

to your cause, and to the best of your knowledge and ability. So help you God." (Rule No. 222, 197 Kan. LXXXIII [now Rule No. 210 (*h*), 201 Kan. LIV].)

The general principles set forth in the oath should serve as a constant reminder to the members of the bar of the grave responsibilities cast upon them in the practice of their profession. These principles form the basis for the ethical standards spelled out by the Canons of Professional Ethics to which reference has already been made.

For the reasons stated in our earlier discussion pertaining to Counts I, III and IV, we have concluded that Phelps has, by his conduct, shown that he does not have the proper concept of the obligations devolving upon an attorney requiring him to deal fairly and honorably with his clients, and enjoining him to demean himself in such manner as not to bring embarrassment to nor discredit upon his profession. The evidence, when considered in its entirety, warrants imposition of disciplinary action by this court, and the commissioner erred in his conclusions to the contrary. Accordingly, Phelps is suspended from the practice of law for a period of two years from the date of this opinion.

IT IS SO ORDERED.