HERMAN C. STOLL *v.* MAYOR AND CITY COUNCIL
OF BALTIMORE.
[No. 66, October Term, 1932.]

*Decided October 6th, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Emory H. Niles,* with whom was *H. Warren Buckler, Jr.,* and *Niles, Barton, Morrow & Yost,* on the brief, for the appellants.

*R. E. Lee Marshall, City Solicitor,* and *Paul F. Due, Deputy City Solicitor,* for the appellees.

DIGGES, J., delivered the opinion of the Court.

On July 13th, 1932, a decree was passed by the Circuit Court of Baltimore City dismissing the appellants' bill of complaint in this case. Owing to the fact that there is here presented a case of large magnitude and of great interest and importance to the citizens of Baltimore City, as well as to the municipal authorities, and to the further fact that a delay in hearing the case on appeal until the regular October term might, and probably would, have occasioned inconvenience and large loss to the city, upon application of the parties, this court met in special session on September 2nd to hear

and determine the questions involved. A few days thereafter, a decision was made and handed down affirming the decree of the chancellor. We will now proceed to give our reasons in support of that conclusion.

The proceeding was instituted by certain taxpayers of Baltimore City seeking to enjoin the Mayor and City Council of Baltimore, its officers, agents, servants, or employees, including the board of awards, from erecting or constructing a plant for the destruction of garbage by incineration or any other method upon Reed Bird Island, or at any other place within nine miles of Lazaretto Lighthouse on the Patapsco River; to enjoin the defendants from acting in any way in the reception, opening, or examination of bids received or to be received in accordance with the specifications and plans embodied in the proposals submitted for bid by the city, and from taking any action, awarding any contract, accepting any bond, or incurring any obligation, under or in accordance with any contract, made or to be made as a result of said proposals and specifications, until the final determination of these proceedings on appeal; and asking that all acts, measures, and things done or to be done pursuant to or in accordance with said specifications and proposals be declared illegal and void. The case was heard by the chancellor on bill, answer, exhibits, and testimony offered by the complainants. At the close of the complainants' testimony the chancellor indicated what his decision would be, and the defendants therefore offered no testimony, resulting in the decree dismissing the bill. Apparently for this reason the record does not contain as full a statement of the facts and conditions surrounding the making of the proposed contract as is desirable in such cases; and we are confined to the case as made by the record, including logical inferences deduced from the facts stated in the bill, answer, and testimony.

It appears that, at the time of the institution of the proceeding, the city was disposing of its rubbish and garbage in the following manner: The rubbish was being collected either by the city, or some one under contract for that purpose with the city, and conveyed to two city-owned and oper-

ated incinerators, where it was disposed of by burning. The garbage was collected by the city and conveyed on scows to a privately owned reduction plant located at Bodkin Point in Anne-Arundel County. This method of disposal of the garbage was in pursuance of a five-year contract ending January 1st, 1932. When the time for the termination of this contract arrived, the city had made no different provision for the disposal of the garbage, and renewed or extended the contract for an additional term ending January 1st, 1933, for an additional sum of about $80,000 over and above the previous yearly cost. Under these conditions the city authorities determined that the most approved and best method of garbage disposal was by incineration. It owned a small island in one of the tributaries of the Patapsco River, being within the city limits, known as Reed Bird Island, well adapted for the location of a garbage incineration plant. The determination was that it was to the best interests of the city, considering its present finances, to make a long-term contract for the disposal by incineration of the garbage and rubbish from the city; this service to be contracted and paid for on a unit basis of a 2,000-pound ton. In respect to the rubbish, the proposal required the collection and delivery over a period of five years of all rubbish of the city, estimated at 120,000 tons per year, and delivered partly at the garbage incineration plant to be erected, and partly at the rubbish incineration plants now owned and operated by the city; the part to be delivered at the garbage incinerator to be mixed with garbage in certain proportions of about 35-65 per cent. for the purpose of aiding in the burning of the garbage. As to the garbage, the proposal required the destruction by incineration of all the garbage of the city during a period of ten years, and the establishment and operation of a garbage incineration plant at Reed Bird Island for that period. This also was to be a bid on units of garbage of 2,000-pound tons. The proposed contract was to be an entire one, and obligate the successful bidder to collect and deliver the rubbish as and for the period stated, and to dispose of the garbage by incineration, together with such rubbish as was

required to be mixed therewith, for the period stated, which necessitated the building of a garbage incineration plant at the location named, at the first expense of the successful bidder, the cost ultimately to be paid by the city by inclusion in the unit prices for the collection of the rubbish, and the disposition of the rubbish and garbage. The garbage incineration plant was to be built on city property, and owned by the city, and possession thereof to be turned over to the city at the expiration of ten years from January 1st, 1933. In other words, the proposal was for the collection and hauling of rubbish; the construction, maintenance, and operation of an incineration plant; and the incineration of garbage and rubbish. The price for performing the complete contract was the total of the following unit prices: (1) For collecting and hauling rubbish, estimated at 120,000 tons per year, the sum of $——— per ton; (2) for evaporating and incinerating rubbish, estimated at 44,000 tons per year, the sum of $——— per ton; (3) for evaporating and incinerating garbage, estimated at 80,000 tons per year, the sum of $——— per ton. The specifications required that the successful bidder give a bond in the amount of the estimated cost of the erection and equipment of the incineration plant, plus $100,-000, conditioned on the faithful and exact performance of the entire contract and each of its provisions.

The appellants contend that the plan and proposed contract of the city is illegal for two reasons: First, because the plans and specifications, as prepared by the city for the proposed incinerator, the collection vehicles, and the means of incinerating garbage and rubbish, are not sufficiently complete and definite to comply with sections 14 and 15 of the Baltimore City Charter, but, on the contrary, are so incomplete and indefinite that it is not possible to determine from bids submitted in accordance with them which is the lowest bid or who is the lowest bidder; second, because the construction of the proposed incineration plant at Reed Bird Island, which is within nine miles of Lazaretto Lighthouse, constitutes a violation of chapter 205 of the Acts of 1908, now codified as section 294 of article 2 of the Code of Public Local Laws.

These are the two questions presented for our determination and will be disposed of in the order presented.

The plans and specifications upon which bids were solicited are filed as an exhibit in the case, embracing a hundred and four typewritten pages, and setting forth in much detail the service and work to be rendered and the materials to be furnished. The evidence shows that these plans and specifications are those generally and commonly used for proposals to erect, maintain, and operate garbage incineration plants, wherever the main purpose of the municipality is an operation contract which will secure a definite desired result, guaranteed by the contractor by the giving of a bond for the faithful performance of the contract and the complete attainment of the result specified and contracted for; and this without regard to whether or not the collection of rubbish or garbage is included in the contract. This operating contract continues over a comparatively long period, and while the record does not disclose the estimated cost of the plant, it is stated in argument that its cost is only about ten per cent. of the total contract price. The particular omissions in the plans and specifications complained of are that the plan of the building is not specific, and the machinery and appurtenances are not specifically mentioned. An examination of the specifications discloses a general description of the building to be erected, specifically such items as the foundation, piling, brick, masonry, roof, floors, windows, ceilings, electrical work, plumbing, drainage, ventilation, and heating. The only thing not set forth specifically, of which the appellants complain, is the particular form and arrangement of the incinerator building; and there is a failure to describe in detail the machinery to be installed. It is apparent that specification on these items was intentionally omitted by the city, so that the bidders could determine the make and type of the machinery which they would employ, and the successful bidder could arrange the building so as to accommodate the machinery selected by him. It is argued that the failure in this respect is in violation of the provisions of sections 14 and 15 of the City Charter (Code Pub. Loc. Laws 1930, art. 4), in that it

prevents real competition in the bidding, and makes it impossible to truly determine the lowest bid. These charter provisions do not prescribe specifically what the plans and specifications shall contain, but are clearly intended to secure the fullest and fairest competition among bidders that the circumstances of each particular undertaking will permit. See *Baltimore City v. Flack,* 104 Md. 107, 64 A. 702, which was a case dealing with plans and specifications for a patented article, and holding that the designation of the patented article or process in the plans and specifications did not preclude free and full competitive bidding as required by the charter, especially where such article was on the general market and available to all bidders.

The object sought by sections 14 and 15 of the City Charter, and similar provisions, is to encourage bidding for municipal contracts and prevent favoritism and extravagance in the awarding thereof. In order to accomplish this, the plans and specifications should set forth clearly and in sufficient detail the proposed work or materials desired, to furnish the same standard for each bidder. In *Packard v. Hayes,* 94 Md. 233, 51 A. 32, the proposal was for bids for the collection and removal and disposal of garbage. The invitation contained full and particular regulations for the collection and removal of garbage and refuse, but contained nothing in reference to the scheme or plan to be put in operation for the disposal or reduction thereof, more specific than that the contractor must establish and maintain, without cost to the City of Baltimore beyond the price stated in its proposal, such scheme or schemes as the bidder might submit. This resulted in as many different methods or schemes of disposal as there were bidders, and it was held that the board of awards, whose only power was declared to be to open the bids and award the contract to the lowest responsible bidder, was unable to determine who was the lowest bidder, and had no power to select a scheme proposed by one bidder above another. This is undoubtedly a salutary and safe rule, and is supported by many decisions in cases where the facts were closely analogous to those in *Packard v. Hayes, supra.* We do not think that the

facts disclosed by this record are so clearly analogous to the facts in that case as to make it controlling. While the plans and specifications should be specific, they are not required to be in more detail than is reasonably necessary for the attainment of the object sought by the contract. *McQuillin on Municipal Corporations* (2nd Ed.), vol. 3, sec. 1310, p. 888.

In the present case the contract is in great measure an operating one. The object to be attained is the incinerating of the city's garbage and rubbish in an inoffensive manner; and this result is required to be guaranteed, with elaborate provision made for tests, at the beginning of the operation and from time to time, to determine whether or not such result is accomplished and maintained. It is shown by the complainants' expert, the only witness in the case, that if the municipality specified in detail every part of the incinerating apparatus, no contractor would guarantee the result; and the municipality must, under such circumstances, take the responsibility for its efficiency. This being true, an enforcement as to details of specifications contended for by the appellants would effectually prevent the guaranteeing by the contractor of the efficiency of an operating contract. There is thus presented a question of policy which must be held to be within the power of the city to determine. Whether the city choose one or the other policy, there remains the limitation that the plans and specifications contained in the invitation to bid must be such as to insure fair competition and enable the authorities to award the contract to the lowest responsible bidder. While it is true in the present case that the bids submitted are not required to be on the same incinerating apparatus, or the form and arrangement of the building in which it is installed, nevertheless they are contracting for the identical result, which is the object sought under the contract by the city. This result must be attained through guaranties fully protecting the city and determined by the right of frequent test. Our conclusion on this point is that the proposed contract in this case is not violative of the letter or spirit of sections 14 and 15 of the Charter.

The second question is whether or not the erection of an incinerating plant at the location proposed would be violative of chapter 205 of the Acts of 1908, now codified as section 294 of article 2 of the Code of Public Local Laws. The title to this act is, "An Act to prohibit the erection of any garbage reduction plant within nine miles from the Lazaretto Light House, on the Patapsco River"; and it provides that no person, firm or company or corporation shall be permitted to erect, construct or establish a garbage reduction plant at or on any place within nine miles of the Lazaretto Lighthouse, on the Patapsco River, and all persons, firms, companies, or corporations are hereby prohibited from erecting, constructing or establishing such plant or plants for the reduction of garbage, offal or similar refuse at or on any place within the said limits. Reed Bird Island, where, under the proposed contract, the incinerating plant will be located, is within nine miles of Lazaretto Lighthouse; and the question therefore is: Does the prohibition against the construction and establishment of a garbage reduction plant within that area also prohibit the construction and establishment of a garbage incineration plant?

The term "reduction works" is defined by many lexicographers as a crematory for the disposal of garbage and refuse of the city. This definition, taken in its broadest sense, can be said to include an incinerating plant, and, it is argued, is the popular conception. There is a clear distinction in the popular mind between a reduction plant and an incinerating plant; the former conveying the idea of so handling a substance as to change its form, usually reduce its volume, and extract something of value from it; while the latter conveys a distinct impression that the substance will be consumed and destroyed. Be this as it may, in the technical use of these terms, the above distinction is recognized and observed, and is fully borne out by the record in this case.

The appellants' witness, who describes himself as a "consulting sanitary engineer specializing in sanitary engineering pertaining to sewerage work, sewerage disposal, garbage and rubbish collection and disposal, industrial waste material,

odors and other kindred departments," after qualifying as such an expert, states that his firm was retained by the City of Buffalo to make a study of bids received by the city for both garbage reduction and garbage incineration. Later, when describing a plant location in Washington, D. C., the plans and specifications for which he had prepared, he states: "These were incineration plants, and, put in the technical parlance, I think there is no question but an incinerator burns the rubbish and garbage, and a reduction plant converts the material into a lesser offensive matter called tankage, and into a grease which can be sold." Again, the witness was questioned by the court: "Q. What is an incinerating plant, in your estimation, Mr. Eddy, a garbage incineration plant? A. I will answer the question by stating that a garbage incineration plant is a plant to dispose of garbage by burning it and reducing the garbage to ashes. Q. Now, then, what is a garbage reduction plant? A. A garbage reduction plant is a plant in which garbage is converted or reduced to less offensive material, which sometimes is grease, but not always; sometimes a solid material called tankage, which may be used as fertilizer, but not always; sometimes a material which can be used for stock feeding, and it may contain a large percentage of grease. Q. Now, you will help me a great deal if you will tell me what the specifications in this case, this proposed incineration plant down on Reed Bird Island, require the residuum to be, after the remainder goes through, whether ashes, tankage, soap, grease, or what not? A. Ashes. Q. Any tankage? A. No tankage, no stock feed, no grease. Q. (By Mr. Niles): When you define that, do you define it in the technical sense or in the—— A. In the technical sense, as is well known in the engineering profession today."

And this distinction is admitted by the appellants, in whose brief it is stated: "It can not be denied that in the technical parlance of sanitary engineers, this distinction is clearly understood and recognized."

In *Halsey v. Adams,* 63 N. J. Law, 330, 43 A. 708, 709, in speaking of the word "reduce," the court said: "There are

but few words in our language that have so many technical meanings as this one. In the medical profession instructions to reduce a fracture would mean one thing; in the military world, to reduce a fort, quite another; to the mathematician, to reduce a problem, another; to the chemist, to reduce a substance, still another; and so on." What is there said with reference to "reduce" is equally applicable to "reduction," and clearly demonstrates that the word has a different technical meaning dependent upon the subject to which it is applied.

It is well settled by the decisions of this court and elsewhere that, where a doubt exists whether a technical or broad popular meaning is to be attributed to a phrase in the statute, a proper construction can only be made after inquiry into what evil the Legislature intended to prohibit by the passage of the statute in question. *Healy v. State,* 115 Md. 377, 80 A. 1074; *Riggin v. Wyatt,* 139 Md. 476, 115 A. 755; *Fitzwater v. Youghiogheny Hydro-Electric Corp.,* 149 Md. 461, 131 A. 776. The undoubted purpose of the Legislature in enacting the legislation in question was to prevent the location within the prescribed area of a plant which would create a disagreeable inconvenience, and perhaps a menace to the health of the people in a thickly populated area. The evil legislated against was the spreading of obnoxious gases and odors, and the collection of vermin by reason of the storage of large quantities of garbage. The testimony is that a properly constructed and operated garbage incinerator produces none of the menace or inconvenience mentioned. Therefore the purpose of the Legislature would be in no wise defeated or frustrated. The advancement made in the science of sanitary engineering has resulted in the elimination of the evil arising from the location of such a plant. We think sound reason fully justifies the construction at this time that the act does not include garbage incineration plants, because, as stated in *Baltimore v. Root,* 8 Md. 95, quoting from *Dwarris on Statutes:* "In law all cases cannot be foreseen or expressed; the object of interpreting laws by what is called equity, is to supply, as far as possible, this defi-

ciency, by a recurrence to natural principles of justice." In *State v. Boyd,* 2 G. & J. 365, 374, the court said: "Statutes are sometimes extended to cases not within the letter of them, and cases are sometimes excluded from the operation of statutes, though within the letter; on the principle that what is within the intention of the makers of a statute, is within the statute, though not within the letter; and that what is within the letter of a statute, but not within the intention of the makers, is not within the statute, it being an acknowledged rule in the construction of statutes, that the intention of the makers ought to be regarded."

Without the intervention of the statute, the city, private corporation, or individual, had the right to establish and operate a garbage disposal plant at the point here contemplated for its erection, without legal interference so long as it did not create a nuisance. The statute being in derogation of the common law and natural right, the canon of construction requires that the statute be given a strict interpretation. Again, the rules of construction require us to consider the result which may follow from one construction or another of a statute, as a potent factor in determining the legislative intent. If the erection of the plant here in question would not produce the evil, the prevention of which was the impelling motive in passing the legislation (and this is established to our entire satisfaction), the construction that an incineration plant is included in the term "garbage reduction plant" would result in the necessity of establishing the plant outside of the designated area, thereby greatly increasing the tax burden for disposition of the city's garbage. But it is asked why this construction would not permit the erection of a garbage reduction plant on Reed Bird Island, the testimony being that a properly constructed and operated reduction plant could be equally inoffensive. The answer is that that plant is the precise character of plant which is interdicted by the legislation, while an incineration plant is not, and therefore it is left open for judicial determination whether it is or is not prohibited. If at the time the legislation was enacted both types of garbage disposal were in use,

294

it is to be presumed that the Legislature was aware of that fact, and in specifically naming one and omitting the other, it was done intentionally. If, on the other hand, reduction plants were the only type in use, it is not to be presumed that the Legislature intended to include all future methods of garbage disposal, when it is shown that they would not create the evils which the Legislature intended to guard against.

Our conclusion on the second point is that the term "garbage reduction plant," as used in the statute, must be given its technical significance, and does not include an incinerating plant.

The foregoing are the reasons which induced us to affirm the decree in this case.

*Decree affirmed.*