## CREST INVESTMENT TRUST, INC. *v.* COHEN, ET UX.

[No. 142, September Term, 1966.]

640

*Decided March 10, 1967.*

*Motion for reargument filed on April 5, 1967, denied on April 11, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.

*Sidney Kaplan* for appellant.

*Leonard J. Harmatz,* with whom were *David H. Cohen* and *Marvin T. Harmatz* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Cohen [1] needed $10,000 to buy a taxicab and the Public Service Commission permit authorizing its use. Crest [2] loaned him the money. Cohen, nearly three years later, says the loan is usurious. The trial court (Harris, J.) agreed with him. Crest

---

1. The appellees are Maurice Cohen and Hazel Cohen, his wife. In this opinion the singular (Cohen) will be used.

2. The appellant (Crest) is Crest Investment Trust, Inc., a Maryland corporation.

contends Code, Art. 58 A, § 22 empowers it to charge, as it did here, 13.46 percent interest. The factual details are not in dispute.

In November 1962 Cohen had been driving a Yellow taxicab for 28 years. He was, at the time, 57 years old. His schooling ended with the eighth grade. When the permit [3] was offered to him he went to Crest and said he needed "100% financing." Crest had him sign a $14,500 note which required 261 successive weekly payments of $55.00 and a final payment of $145.00. The note was secured by a chattel mortgage on the taxicab and the permit. It was further secured by a "Performance Bond Mortgage" on improved leasehold property at 3011 East Monument Street in Baltimore and on his home on Kent Island. The latter mortgage, despite its exotic label, recites the essentials of the note, explicitly declares that it secures the note and "is in consideration of the money loaned" to Cohen. Crest also obtained from Cohen's employer a guaranty, to the extent of $1,500, of Cohen's note. The closing took place on 21 November 1962. From the $14,500 there was deducted $4,500 for "interest/service" and $269 for transfer costs, which includes an attorney's fee of $175. Although the balance shown on the settlement sheet to be due to the borrower was $9,731.00 Crest issued its check, two days later, to Cohen (and wife) for $10,000. They returned it, endorsed, to Crest's attorney, who deposited it, the same day, in his own account. Six months later (15 April) Crest issued another check to Cohen in the amount of $500. This amount, Crest explained, was withheld to pay for a 5 year $10,000 insurance policy on Cohen's life. When Cohen was found to be uninsurable the $500 was paid to him.

In September 1965, having made 139 payments, Cohen filed a suit in which he asked the court to declare the note to be usurious. On 4 April 1966 the court ordered Crest to release the mortgages and mark the note "paid in full" upon the receipt from Cohen of $2,536.70. As the learned chancellor explained in his opinion, that amount was determined "by applying the weekly payments first to interest at a rate of 6% per annum on

---

**3.** The permit was the thing of value. The vehicle itself was incidental.

a direct reduction basis, and the balance to the principal." When Crest appealed the court permitted Cohen to pay the $2,536.70 to the Clerk of the Court.

We shall resist the temptation to enlarge this opinion with still another dissertation on the evils of usury for, despite oft repeated admonitions such as Polonius urged upon his son Laertes, the world is full of borrowers and lenders and the protection of the one from the artifices of the other has been, and probably always will be, a matter of public concern. Cohen does not allege fraud. His counsel stipulated that he was possessed of "business acumen" and that he "knew what he was signing." Thus the issue, while technical, is at the same time simple.

Early in 1957 the deputy Bank Commissioner, at the request of the chief executive of a state bank, asked the Attorney General to express his opinion in respect of the application of the usury laws to the widespread practice of discounting loans, indulged in "by practically every banking institution in the State of Maryland." The Attorney General, answering the first of two specific inquiries, advised the deputy Commissioner that the practice "constitutes usury under Section 3 of Article 49 of the Code." His answer to the second inquiry, i.e., whether the "legislature affirmatively authorize[d]" the practice by Code, Art. 58 A, § 22, because of its present importance and significance, is set forth in full:

"There is little doubt under Section 57 of Article 3 of the Maryland Constitution that the Legislature may exempt from the usury laws under specified conditions certain types of transactions. For example, under Section 16 of Article 58A of the Code, any person, copartnership or corporation which obtains a license to operate a small loan company may charge interest at a rate not to exceed 3% per month on loans not exceeding $300.00. Section 196 of Article 11 permits licensed industrial finance companies, on loans not exceeding $1500.00, to charge 6% interest in advance and to require repayment in equal monthly or periodic instalments. Section 119A of Article 83 authorizes 'finance charges' of 9%, 12% and 15% on the principal

balance of instalment automobile loans, depending on the age of the motor vehicle involved.[4]

"The question to be determined in the present instance is whether the Legislature by virtue of Section 22 of Article 58A of the Code intended to permit banks and other lending institutions to make loans at 6% interest paid in advance, with the principal to be paid off in equal weekly or monthly instalments. The provisions of this statute are as follows:

" 'This Article shall not apply to any person, co-partnership or corporation doing business under any law of this State, or of the United States, relating to banks, trust companies or building and loan associations, or *to companies or corporations making loans at a rate of interest not exceeding 6% per annum, on the principal amount of the loan, in advance,* charging an investigation fee not exceeding four (4%) per cent of the amount of the loan, on loans of Three Hundred Dollars ($300) or less and charging a fee of not exceeding 2% on amount above Three Hundred Dollars ($300) which companies, persons or corporations may require the borrower to give as security for such loan, mortgage on real or personal property, or to purchase Certificates of Investment or choses in action equal in amount to the sum borrowed and *to pay therefor in equal weekly or monthly instalments covering approximately the period of the loan,* provided that the proceeds of said Certificates of Investment or choses in action shall, at the option of the borrower, be received at maturity in payment of said loan.' (Emphasis added.)

"This Section was originally enacted as Section 19 of Chapter 88 of the Acts of 1918, which introduced into the Maryland law a comprehensive plan for licensing and regulating small loan companies. The pro-

4. Cf. *Falcone v. Palmer Ford,* 242 Md. 487, 495, footnote 1, 219 A. 2d 808 (1966).

visions of the 1918 Act, as amended from time to time, now constitute the present Article 58A of the Code. The original language of said Section 19 did not contain the words 'in advance' and in place of the present provisions relating to an investigation fee permitted the charging of a fee not exceeding 2% of the loan 'to cover the cost of investigating the character and circumstances of the borrower and of the co-makers of the borrower's note evidencing the loan. * * *'. The remainder of the said Section 19 was substantially in the same form as the present Section 22.

"By Chapter 564 of the Acts of 1929, this Section was amended and a provision was inserted permitting the charging of a fee in Frederick County not exceeding 4% on loans of $300.00 or less, and 2% on loans above $300.00. Chapter 560 of the Acts of 1939 further amended the Section permitting such increased investigation fees to be charged in all counties throughout the State, providing for the giving of mortgages on real or personal property as security for such loans, and inserting the words 'in advance' in the statute. Since 1939 there have been no further amendments.

"A careful reading of Section 22 in the light of the legislative history above set forth does not, in our opinion, clearly establish that the Legislature intended thereby to exempt the discount procedure under discussion from the application of the usury laws. The primary objective of Section 22 is to specify the types of businesses and lending institutions which would not be subject to the provisions of Article 58A. Had the Legislature likewise intended affirmatively to authorize the practice in question, such might have been accomplished in a far more direct and logical manner. For example, Section 196 of Article 11 clearly spells out the exemption enjoyed by licensed industrial finance companies from the application of the usury laws on loans not exceeding $1500.00. A similar provision in Article 11 applying to other types of lending institutions would have left no doubt that the Legislature in-

tended that the usury laws should likewise not apply to a transaction such as the instant one.

"However, the mere fact that the legislative intent in this instance might have been more clearly or more logically expressed does not impel us to conclude that no such intent existed, particularly since other considerations suggest that the Legislature did intend to permit this practice. The language in Section 22 underlined hereinabove undoubtedly recognizes that lending institutions in the State of Maryland make loans at an interest rate of 6% per annum, payable in advance, and require the borrowers to repay the principal in equal weekly or monthly instalments. The title to Chapter 560 of the Acts of 1939, providing that the amendment therein was 'to alter the amount of the fee allowed to be charged on certain loans by banks and certain other companies', indicates that the Legislature intended to include in this otherwise negative Section at least one type of affirmative grant of power to the banks and other lending institutions involved. The title of Chapter 564 of the Acts of 1929 suggests a like intent. The same sort of affirmative interpretation to negative language in a statute relating to the usury laws was given to Section 121 of Article 23 of the Code by the court in *United Divers Co. v. Commercial Credit Co.*, 289 Fed. 316, 319 (5th Cir. 1923). That Section provides that 'No corporation shall interpose the defense of usury in any action.' The court held that this Section repealed that usury law as applied to corporations and laid down a rule of substantive law applicable in whatever jurisdiction suit on a Maryland contract is brought.

"Any doubt as to the Legislature's intention by Section 22 to exempt from the usury laws the practice in question is resolved by the long-standing administrative construction of this statute. You advise that ever since this Act was initially passed in 1918, commercial banks throughout the State have entered into transactions involving instalment loans of the type under

consideration in an aggregate amount of many millions of dollars. As we have pointed out above, the statute has been twice amended since 1918, and at no time did the Legislature include any language suggesting that the practice in question was improper or illegal.

"You have further informed us that you have been fully aware of this practice and have on several occasions inquired into the proper construction of Section 22. In 1948 you received a letter from the general counsel of the Fidelity Trust Company discussing in detail the legal question here presented. The conclusion reached therein that the discount procedure under discussion was legal was apparently concurred in by you at that time. In addition, we understand that some years ago you further inquired orally of this office concerning the legality of the procedure in question and that you were advised that the practice was not illegal. A long-established administrative construction should not be overturned except for most impelling reasons. *Smith v. Higinbothom,* 187 Md. 115 (1946); *Wells v. Price,* 183 Md. 443 (1944); *American Stewart Distillery Co. v. Stewart Distilling Co.,* 168 Md. 212 (1935).[5] In *City of Baltimore v. Machen,* 132 Md. 618 (1918), the Court of Appeals said the following in this regard at page 623-624:

" 'It is presumed that the Legislature, succeeding the passage of the Act, not only had knowledge of the fact that deposits such as the one before us were to be found in the many banks of this State, but that they also knew of the construction generally placed upon this statute that such deposits were not regarded by the taxing authorities of the State as taxable thereunder (*Baltimore City v. Johnson, supra*), nevertheless we find no amendments to

---

5. To the cases here cited there can be added *State Roads Commission v. Jones,* 241 Md. 246, 256, 216 A. 2d 563 (1966); *Patton v. Graves,* 244 Md. 528, 537, 224 A. 2d 411 (1966); *Sanza v. Md. St. Bd. of Censors,* 245 Md. 319, 226 A. 2d 317 (1967).

the statute passed more than twenty years ago, by which bank deposits are unmistakably brought within its provisions.

" 'This any one of the Legislatures that have convened since its passage had the power to do and no doubt would have done had they thought that the construction placed thereon was inconsistent with the intention of the Legislature that passed the Act; or had they wished to bring bank deposits unmistakably within the provisions of the statute.

" 'Applying the principles announced in *Hays v. Richardson, supra,* and quoted in *Baltimore City v. Johnson, supra,* that an unvarying construction of a statute for such lapse of time "ought not to be disregarded, but upon the most imperious grounds," we do not feel warranted or justified in placing upon the statute a construction differing from that placed thereon by the taxing authorities of the State.'

"Similarly, the Legislature, following the passage of the original Act in 1918, undoubtedly had knowledge of the fact that banks and other institutions employed the discount procedure under discussion, and in 1939 even inserted the words 'in advance' to describe the procedure accurately. In our opinion, there is no impelling reason to depart from a construction of the said Section 22 which has been accepted for many years by your Department and concurred in by the Maryland Legislature.

"We, therefore, conclude that Section 22 of Article 58A exempts from the application of the usury laws the practice in question of discounting 6% interest per annum in advance and requiring the borrower to repay the principal amount of the loan in equal weekly or monthly instalments.

"C. Ferdinand Sybert, Attorney General Alexander Harvey, II, Asst. Attorney General." [6]

However marginal the views of the Attorney General may

---

6. 42 *Opinions of the Attorney General* 68 (1957).

648

have been in March 1957, it must be conceded that subsequent events, or the lack thereof, have enhanced their validity. The Legislature has since met, in either regular or special session, seventeen times and is presently in regular session. It cannot be supposed that the published opinion of the Attorney General rendered to such an important state agency in respect of a business practice in which so many citizens have an interest, can have escaped the notice of the Legislature.[7] Indeed, standing alone the passage of Chap. 871 of the Laws of 1963, Code, Art. 49, § 1 A (Repl. Vol. 1964), would suggest that the Legislature took a hard look at the practice of charging or deducting interest in advance. The language of § 1 A follows:

> "Except in the case of loans secured by a mortgage or deed of trust on real property, interest computed on the principal amount of a loan at a rate permitted by § 1 of this article may be charged or deducted in advance where the borrower is required to repay the indebtedness in equal or substantially equal monthly, or other periodic, installments. Interest permitted by this section shall not be deemed usurious under any other division of this article."

Judge Harris thought it "more logical to assume that * * * [the Act of 1963 (Art. 49, § 1 A)] only legalized certain unsecured loans which had been illegal prior" to its enactment. He attached much significance to the fact that, as originally introduced in the Senate, the bill applied to all loans, whether or not secured by a mortgage or deed of trust on real estate, and

---

7. The opinion of the Attorney General was considered in detail by the Governor's Commission to Study Article 49 of the Maryland Code. The Commission noted in its report to the Governor, in December 1962, that the legality of the practice "is a troublesome problem that should be resolved" and the Commission recommended the passage of legislation to that end. The Commission to Study the State Banking Laws, in its preliminary (January 1963) report, noted the recommendation of the Commission to Study Article 49 and it also urged the passage of the recommended legislation. Senate Bill 307, which became Chapter 871, was introduced by Senator John-Clarence North, who was a member of the Commission to Study Article 49.

that it was amended in the House of Delegates to exclude loans secured by a mortgage or deed of trust on real estate, in which amendment the Senate concurred. From this he draws the conclusion that loans secured by a mortgage or deed of trust on real estate were illegal before the Act of 1963. He was obliged, of course, in reaching his conclusion, to set at naught the opinion of the Attorney General quoted above. Since we think this cannot be done we are unable to agree with Judge Harris' assumption that such loans were illegal before the Act of 1963. In *Popham v. Conservation Comm.*, 186 Md. 62, 71, 46 A. 2d 184 (1946) we said:

> "It thus appears that the old board of Shell Fish Commissioners and its successor have construed the Act * * *. This construction is given greater force because of the opinions of the Attorney Generals [Armstrong and Robinson] and the fact that the reports of the old Board of Shell Fish Commissioners and its successor have, from time to time, been made to the Legislature and that body has not seen fit to interfere with such construction by annulling it through legislation. This contemporaneous construction, long continued under such circumstances, has the force of law. [Citing cases.]

And in *Vaughan v. Boone,* 191 Md. 515, 521-22, 62 A. 2d 351 (1948) Judge Henderson, for the Court, said:

> "If there were any doubt as to the intention of the legislature as gathered from the language of section 44 (as originally enacted by Ch. 239, Acts of 1931) and related sections, it would seem to have been dispelled by the subsequent reenactments of the section, particularly the reenactment of the entire Article 33 of chapter 934 of the Acts of 1945, without substantial change, in the light of consistent rulings by the Attorney General construing the sections so as to impose the time limitation on certificates of nomination to the office of President of the United States, in the elections of 1932 and 1944. See 17 *Opinions of the Attorney Gen-*

*eral,* 123, 128 and 29 *Opinions of the Attorney General* 77. Under recognized principles of statutory construction, the legislature may be deemed to have acquiesced in the contemporaneous construction. *Popham v. Conservation Commission,* 186 Md. 62, 71, 46 A. 2d 184; *Smith v. Higinbothom,* 187 Md. 115, 132, 48 A. 2d 754, 763."

See also *Benco Vending v. Comptroller,* 244 Md. 377, 383, 223 A. 2d 759 (1966).

Judge Harris cited with approval the recent decision by Judge Prendergast in *Rothman v. Silver,* Circuit Court of Baltimore City, Docket 1965 A, folio 666. Since it appears that he felt obliged to follow Judge Prendergast's holding we think it only fair to say that we reversed Judge Prendergast's decision eleven months after Judge Harris filed his opinion. *Rothman v. Silver,* 245 Md. 292, 226 A. 2d 308 (1967).

Cohen ingenuously concedes his inability to produce any authorities with which to belabor Crest. He contends, however, that the vice of this loan is the length of its term. He cites 91 C.J.S. *Usury,* § 34 at 613, which reads as follows:

"This rule does not, however, apply in the case of long term loans; and while it has been said that the line of demarcation between what is a short term loan and what is a long term one, for the purposes of the rule, has not been settled, the rule has frequently been applied where the loan is for a period of one year or less, but only in a few cases has interest been permitted to be taken in advance for any longer period, and in other cases it has been held usurious to discount or take interest in advance, at the maximum lawful rate, for a period longer than one year, unless otherwise provided by statute, although the present worth of interest for a longer period may be deducted in advance without constituting usury."

However desirable, as a matter of economic or social policy, such a restriction might prove to be we do not think it is enough, in the circumstances here present, to justify a holding that Cohen should be relieved of his obligation to perform his contract.

Cohen filed a motion to dismiss the appeal alleging a violation of Maryland Rule 828 c 2. Counsel for Crest made what seemed to us a satisfactory explanation of his apparent failure to comply with the rule in which counsel for Cohen appeared to acquiesce. The motion will be denied.

> *Motion to dismiss appeal denied.*
> *Decree reversed. Appellees to pay*
> *the costs.*