## MORRIS E. NELSON v. REAL ESTATE COMMISSION FOR THE STATE OF MARYLAND

[No. 693, September Term, 1976.]

*Decided March 15, 1977.*

The cause was argued before GILBERT, C. J., and MORTON and LOWE, JJ.

*Carlton M. Green* and *Henry A. Babcock* for appellant.

*Robert J. Aumiller, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court. LOWE, J., filed a concurring opinion at page 345 *infra.*

Having been unsuccessful in defending himself on charges brought before the Real Estate Commission for the State of Maryland and in the subsequent appeal to the Circuit Court for Prince George's County (Mathias, J.), Morris E. Nelson now by way of motion challenges for the first time the jurisdiction of the Commission and the court. Of course, the question of jurisdiction over the subject matter may be raised at any time. *Resh v. Resh,* 271 Md. 133, 314 A. 2d 109 (1974); *Carroll v. State,* 19 Md. App. 179, 310 A. 2d 161 (1973); *Wheeler v. State,* 10 Md. App. 624, 272 A. 2d 96 (1971).

As "back-ups" to the jurisdictional issue, Nelson asserts that the complaint upon which the Commission acted and the circuit court affirmed was barred by the statute of limitations and that the evidence does not support the findings of the Commission. If we agree with Nelson on the jurisdictional issue, we need not journey through the statute of limitations nor the sufficiency of the evidence. We are, however, compelled to complete the sojourn because we are not *d'accord* with Nelson's view of the jurisdictional scope of the Commission, and thus, of the circuit court.

We shall now set the scene from which this controversy arose.

John Meredith Tayler, an English and Canadian lawyer, on June 6, 1971, read an advertisement in the *Washington Post*. The ad read as follows:

"Apt.—4 units in heart of Riverdale. Older type. Excel. potential. Assume $21,000 loan. Asking $29,500. Owner leaving area. Prin. call 772-0033."

Mr. Tayler responded to the ad by telephoning the listed number and spoke with the appellant, Nelson, who identified himself as a real estate broker. Nelson provided Tayler with particulars concerning the property. Tayler met with Nelson and inspected the apartments which were located at 4409 Queensbury Road, Riverdale, Maryland. Tayler testified before the Commission that Nelson, in reply to a question by Tayler, stated that the property was licensed for apartment usage. Nelson produced a temporary certificate from the Prince George's County Department of Inspections and Permits. Nelson informed Tayler that a permanent certificate would be forthcoming when certain necessary repairs to the property were completed. Tayler verified the information received from Nelson with an unnamed individual employee of the Department of Inspections and Permits. Tayler then entered into a contract to purchase the property. At the time Nelson signed the contract as "contract owner," title to the property was in one Rogers, who apparently was a straw party.

Immediately prior to settlement, which occurred within a few days of the execution of the contract of sale, Tayler requested Nelson to give written assurance that a license would be issued when the necessary repairs to the property were completed. Nelson penned upon the reverse side of the contract of sale, "Notwithstanding anything in the contract, subject property described herein is sold as a bona fide apartment house." Both Nelson and Tayler subscribed their respective names under the sentence that Nelson had written. Tayler proceeded to settlement and executed a deed of trust note in the amount of $8,750 in favor of Nelson. The

record is not clear as to whether Tayler assumed the outstanding $21,000 obligation then existing upon the property.

Sometime later, Tayler received a letter from the appropriate authorities requesting that he apply for an apartment house license. The letter was prompted by a complaint filed by a neighbor or tenant.[1] In investigating the complaint, the Department learned of the transfer of the ownership of 4409 Queensbury Road. Tayler applied for the license, but it was denied on the ground that the property was in a single family residential zoning area. Efforts by Tayler to show a non-conforming use or to obtain rezoning failed. We do observe that Tayler, in his application for a use permit, sought five (5) apartments. Being unable to utilize the property for four apartments, Tayler lost the property at foreclosure. He filed a complaint with the Real Estate Commission against Nelson. For reasons that are unclear in the record, the complaint was dismissed, seemingly without a hearing, in 1974 but reopened in 1975.[2] No reason is stated in the record as to why the Commission subsequently turned 180 degrees and proceeded on the matter. In any event, Nelson did not appear at the hearing but confined his defense to a letter to the Commission in which he denied any wrongdoing. Nelson opined that he would not "subject" himself ". . . to further harassment in this case, which has continued for many months." After setting out his view that Tayler lost the property because of his own mismanagement and was endeavoring to use Nelson "as an escape," Nelson concluded by stating, "With that, I am perfectly willing to stand on the facts as determined by the commission based upon your investigation and whatever other information is available to you from any source."

---

1. The complainant is shown in the record as residing at 4409 *Glenbury* Road. At times, the *Queensbury* property is referred to in the record as the *Glenbury*.

2. Under date of September 23, 1974, the Real Estate Commission wrote to Tayler with respect to Nelson, "Please be advised that a complete investigation and review of the above captioned case by the Real Estate Commission of Maryland has determined that there has been no violation of the Real Estate Law." The Commission concluded by stating that it was "dismissing this case and closing our file."

The Commission found that Nelson had wilfully misrepresented the property that he sold to Tayler, and it, on December 26, 1975, revoked Nelson's license, ordered his salesmen's licenses surrendered, canceled his real estate listings, and directed Nelson to ". . . cease and desist from the practice of real estate. . . ."

As we have indicated, Nelson now challenges the jurisdiction of the Commission in the first instance. Nelson contends that the Commission records, as introduced into evidence at the hearing, disclose that Nelson was not a licensed broker during the period "November 1, 1970 to November 1, 1971," the time frame "within which the alleged misconduct occurred." *Ergo*, Nelson reasons, inasmuch as he was not licensed at that time, he and any acts committed by him with respect to Tayler were outside the ambit of the Commission's jurisdiction.

Nelson also contends that he was selling his own property and not acting as a broker. The Supreme Court of South Carolina in *South Carolina Real Estate Comm'n v. Boineau,* 230 S.E.2d 440 (1976) considered and rejected a similar argument. The Court said:

> "The prinicpal issue in the appellant's contention that in all of these four transactions he was acting not as a real estate broker, but on his own behalf. He argues that the grounds set forth for revocation of a real estate license, . . . apply solely to activities of a broker while acting in his broker capacity. We disagree. Even as members of the bar are subject to disciplinary procedures for conduct not strictly related to the practice of law, realtors may have their licenses revoked for conduct not strictly related to a transaction in which they are acting as broker." 230 S.E.2d at 441-42.

We think Nelson's argument must fail because Md. Ann. Code art. 56, § 224 (a) provides in pertinent part that the Commission may investigate ". . . the actions of any real estate broker or real estate salesman, *or any person who shall assume to act in either such capacity within this*

*State. . . ."* (Emphasis supplied.) The statute specifically confers jurisdiction upon the Commission to investigate not only real estate brokers and salesmen but also those who "assume to act" as brokers or salesmen. In the case *sub judice,* the uncontradicted testimony was that Nelson held himself out to Tayler as a real estate broker, thus thrusting himself clearly within the Commission's jurisdiction.

We think it would be seriocomic to construe § 224 (a) so as to allow the Real Estate Commission to call to task those brokers who violated the Commission's precepts while acting as brokers and at the same time carve from the Commission's jurisdiction the very same violations, committed by the identical broker, in a non-broker capacity. In the former instance, the broker might be branded as unethical but in the latter, even though the broker committed the same violation, he would retain, officially, his good character. *McKnight v. Florida Real Estate Commission,* 202 So. 2d 199 (Fla. App. 1967).

Nelson next asserts that the proceedings against him should have been barred by the statute of limitations, Md. Cts. & Jud. Proc. Code Ann. § 5-107. That section provides:

> "A prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed."

Nelson contends that on its face the proceedings brought against him are violative of the statute. Without attempting to discuss *ad nauseam* all the reasons why Nelson's argument is founded on shifting sand, we shall point out but three.

I.

The proceedings before the Commission had as its objective the protection of the public from "sharp" practices of real estate brokers. Just as members of the bar are subject to disciplinary proceedings for professional misconduct, even though not strictly related to the practice of law, so are real estate brokers.

The Court of Appeals has not, so far as we are aware, considered Courts Art. § 5-107 or its predecessor, Md. Ann. Code art. 57, § 11, with respect to real estate brokers. It has, however, on a number of occasions ruled that limitations do not apply in attorney grievance matters. Recently, in *Bar Ass'n of Baltimore City v. Posner,* 275 Md. 250, 339 A. 2d 657 (1975), the Court summarily rejected Posner's theory that laches or limitations was a defense to the Bar Association's disbarment proceeding against him, pointing out that the purpose of the proceeding was the protection of the public.

In *Anne Arundel Bar Ass'n v. Collins,* 272 Md. 578, 582-83, 325 A. 2d 724, 727 (1974), Judge Levine, writing for the Court said:

"Although it does not appear that we have considered the question previously, courts elsewhere have uniformly held that disciplinary proceedings against attorneys are not barred by a general statute of limitations, *In Re Heinze,* 47 N.W.2d 123, 125 (Minn. 1951); *In Re Woodward,* 300 S.W.2d 385, 387 (Mo. 1957); *State v. Bates,* 162 Neb. 652, 77 N.W.2d 302, 304 (1956); *In Re Wright,* 310 A. 2d 1, 9 (Vt. 1973); *see In Re Ratner,* 194 Kan. 362, 399 P. 2d 865, 873 (1965); *Harrison v. Commonwealth,* 305 Ky. 379, 204 S.W.2d 221, 222 (1947). *This* is so primarily because *a disciplinary proceeding is neither an action at law, Maryland St. Bar Ass'n v. Boone,* 255 Md. 420, 430, 258 A. 2d 438 (1969); *Braverman v. Bar Ass'n of Balto.,* 209 Md. 328, 121 A. 2d 473 (1956), *cert. denied,* 352 U. S. 830, 77 S. Ct. 44, 1 L.Ed.2d 51 (1956); *nor a criminal prosecution, Balliet v. Balto. Co. Bar Ass'n,* 259 Md. 474, 478, 270 A. 2d 465 (1970); *Braverman v. Bar Ass'n of Balto., supra,* at 348. In *Braverman, supra,* we said:

'The action of a court in exercising its power to disbar or suspend an attorney is judicial in character, but the inquiry is in the nature of an investigation by the court

into the conduct of one of its own officers, and is not the trial of an action at law, as the order which is entered is only an exercise of the disciplinary jurisdiction which a court has over its officers. . . .' 209 Md. at 336.

We hold that the general period of limitations prescribed by Art. 57, § 1 does not apply to disciplinary proceedings brought against members of the Bar." (Emphasis supplied.)

We are unable to perceive any difference between protecting the public from unscrupulous practices by an attorney and the same type of practice by a real estate broker.

## II.

As with matters before the Attorney Grievance Commission or the Judicial Disabilities Commission, the regulatory action by the Real Estate Commission is "neither civil nor criminal in nature." *In re Diener*, 268 Md. 659, 670, 304 A. 2d 587, 594 (1973). A hearing before such an administrative body is not a "prosecution" nor is it a "suit." We construe the words "prosecution" and "suit" as used in Courts Art. § 5-107 as follows:

"Prosecution" means a criminal action brought by the State, in a court of competent jurisdiction, by way of indictment, information, or other charging document, against an accused for violation of the common or statutory criminal laws of this State.

"Suit" means an action at law or equity brought in a court having jurisdiction over the subject matter.

The key word in both definitions is "court." Patently, an administrative agency is not a "court" and thus the proscription contained in § 5-107 is not applicable thereto.

The principal purpose of a hearing before the Real Estate Commission is to determine the fitness of a licensee. We subscribe to the view expressed by then Attorney General

Hall Hammond (later Chief Judge of the Court of Appeals) that:

"[A] hearing before an administrative board to determine whether a license shall be revoked or suspended is neither a prosecution nor a suit within the meaning of the statute of limitations." 36 Op. Att'y Gen. 97, 98 (1951).[3]

The Legislature, which is presumed to know of the interpretations made of statutes by the Attorney General, *Jackson Marine Sales v. St. Dept.*, 32 Md. App. 213, 359 A. 2d 228 (1976); *Demory Brothers v. Bd. of Pub. Works,* 20 Md. App. 467, 316 A. 2d 529 (1974), *aff'd,* 273 Md. 320, 329 A. 2d 674 (1974). *See also Crest Investment Trust, Inc. v. Cohen,* 245 Md. 639, 648, 227 A. 2d 8, 13 (1967); *Read Drug & Chemical Co. v. Claypoole,* 165 Md. 250, 257-58, 166 A. 742, 745 (1933), has met at least annually since Attorney General Hammond handed down his opinion in 1951, but that body has not changed the statute. Thus, the General Assembly has *sub silentio* tacitly approved the Attorney General's interpretation.

We hold that the statute of limitations is not applicable and may not be pleaded as a bar to a proceeding before the Real Estate Commission when the subject before the Commission is a determination of whether a license will be suspended or revoked.

### III.

The record shows that Nelson, by letter, submitted to the jurisdiction of the Commission. At that time, he did not interpose any question of limitations. In fact, the issue of limitations appeared for the first time in the appeal from the Commission to the circuit court. The failure on Nelson's part to raise limitations as a bar to the proceeding before the Commission, even if it could have been properly raised, is, in any event, tantamount to a waiver of that defense.

---

**3.** A similar opinion was rendered in 54 Op. Att'y Gen. 220 (1969).

Finally, Nelson asseverates that the evidence before the Commission did not support a finding of "willful misrepresentation." Based on the evidence submitted to it, the Commission held the following, which we quote with minor editing:

"In order to sustain a charge under Section 224(b), the State must prove two facts:

1. Any statements the licensee made to the complainant were false, and

2. At the time the licensee made such statements, he knew them to be false.

. . . [As to the] first fact, the State produced a newspaper advertisement for the property in question. The ad was listed under 'Investment Property' and stated 'APTS. — 4 units'. The State also produced the contract of sale, on the back of which . . . [Nelson] wrote that the property was a 'bona fide apartment house.' From the testimony of . . . Mr. Taylor [sic], the Commission finds that . . . [Nelson] never mentioned to him that there was any type of zoning problem. In fact, . . . [Nelson] told Mr. Taylor [sic] that he — Taylor [sic] — could have obtained the requisite license by making certain repairs.

No where, however, does it appear that . . . [Nelson] made any flat statement to the effect that there were no zoning problems.

. . . [T]he question the Commission must first determine is whether these statements and writings of . . . [Nelson] are false representations. The Commission finds that the ad, the statement on the back of the contract, and . . . [Nelson's] statement about the availability of a license clearly implied that there were no zoning problems affecting the usage of the structure as a four-unit apartment building. Because of this implication which the Commission finds so clear, in the absence of any disclaimer by . . . [Nelson], the Commission

concludes that ... [Nelson's] ad, writing on the contract, and statement about the license are false by implying the existance [sic] of no problem when in fact there was clearly a substantial problem.

... As to the second fact — knowledge of ... [Nelson] at the time — the State presented an affidavit of ... [Nelson], which affidavit was dated March 4, 1975. Paragraphs 5 and 8 thereof indicate that, at the time the contract was signed, ... [Nelson] knew that there was a problem with the zoning of the property and that, in 1970, a license had been denied because of it. ... This is confirmed by ... [Nelson's] letter of October 8, 1975. ... The affidavit of Doug M. Smiley dated March 29, 1975 also confirms that ... [Nelson] knew at the time of contract that the property did not have the requisite zoning for a four-unit apartment house.

... [Nelson] claims that the 1970 zoning decision was erroneous or a clerical error and that the apartments were a legal, non-conforming use. ... [Nelson] bases this upon his allegation that a Use and Occupancy permit #5160U was issued in 1961. The County's records are ... unclear, but fail to substantiate that a permit was indeed issued in 1961. The obvious zoning violation and the fact that there is no record of a previous application for a non-conforming use indicate that the permit was never issued."

Judge Powers, for this Court, in *Comm'r v. Cason*, 34 Md. App. 487, 368 A. 2d 1067 (1977), discussed in depth the role of the courts when reviewing an appeal from an administrative agency. *Comm'r* makes transpicuous that irrespective of the test employed by the courts — substantial evidence, fairly debatable, clearly erroneous, or against the preponderance or weight of the evidence — the court is limited in a review of the agency's finding and is not free to substitute its own finding for that of the agency. Even though we might disagree with the conclusions drawn by the

agency from the evidence, we are not at liberty to disregard those conclusions and substitute our own. *State Insurance Commissioner v. National Bureau of Casualty Underwriters*, 248 Md. 292, 236 A. 2d 282 (1967).

We believe there was ample evidence for the Commission to find, as it did, that Nelson wilfully misrepresented the zoning situation to Tayler and knew at the time that he was so doing. Judge Mathias, in our view, properly upheld the findings of the Commission.

> *Motion for order as to juris-*
> *diction denied.*
> *Order affirmed.*
> *Costs to be paid by appellant.*

*Lowe, J., concurring:*

Although I concur in the result reached by the majority, I cannot agree with reasons I and II why they believe that the statute of limitations does not apply. Because I think that waiver by nonassertion at the administrative and nisi prius levels is dispositive of the issue of limitations on this appeal, Md. Rule 1085, my opinion may well be an exercise in semantics. I am concerned, however, that we analogize a businessman's license procedure to the responsibilities of the Court of Appeals in disciplining an officer of the Court in reason I. Furthermore, it disturbs me when I see an appellate court perpetuating guidelines without support of reason, as appear in reason II.

I

The majority equates the disciplinary proceeding of a real estate salesman with the disciplinary proceeding of an attorney. But the very cases relied upon for that analogy rest on reasoning totally inapplicable to the lay world. The case quoted at length by the majority rejects any such analogy. Judge Levine, writing for the Court in *Anne Arundel Co. Bar Ass'n v. Collins*, 272 Md. 578, 582-583, stated:

"Although it does not appear that we have

considered the question previously, courts elsewhere have uniformly held that disciplinary proceedings against attorneys are not barred by a general statute of limitations, . . . . In *Braverman* [*v. Bar Assn. of Balto.*, 209 Md. 328], *supra,* we said:

'The action of a court in exercising its power to disbar or suspend an attorney is judicial in character, *but the inquiry is in the nature of an investigation by the court into the conduct of one of its own officers,* and is not the trial of an action at law, *as the order which is entered is only an exercise of the disciplinary jurisdiction which a court has over its officers. . . .*' 209 Md. at 336." (emphasis added).

It is therefore clear that the sole basis for circumventing the limitations statute was the special relationship between an attorney and the court he serves. I see no basis for concluding that a realtor has a comparable relationship with the Real Estate Commission.

## II

The second reason assigned by the majority is bifurcated. It first states that there is no "prosecution" or "suit" because prosecutions and suits must take place in a "court" and

"Patently, an administrative agency is not a 'court' . . . ." Majority Opinion p. 341.

The negatively restricted interpretation of the word "court" implicit in that statement does not appear to be supported by any dictionary definition. The twelve alternate definitions in *The American Heritage Dictionary of the English Language* do not restrict "court" to a particular room set aside for judicial trials and presided over by a constitutionally designated judge. To the contrary, the

breadth of definition and variety of interpretation gives an entirely different picture:

"*court* . . . 1. An extent of open ground partially or completely enclosed by walls or buildings; courtyard. 2. A short street; especially, an alley walled by buildings on three sides. 3. A large, open section of a building, often with a glass roof or skylight. 4. Formerly, a mansion or other large building standing in a courtyard. Now used only in proper names. 5. The place of residence of a sovereign or dignitary; a royal mansion or palace. 6. The retinue of a sovereign, including the royal family and his personal servants, advisers, ministers, and the like. 7. A sovereign's governing body, including the council of ministers and state advisers. 8. A formal meeting called for and presided over by a sovereign. 9.a. A person or body of persons appointed to hear and submit a decision on civil cases. b. The building, hall or room in which cases are heard and determined. c. The regular session of a judicial assembly. 10. Any similar authorized tribunal having military or ecclesiastical jurisdiction. 11. An open, level area, marked with appropriate lines, upon which tennis, handball, basketball, or another game is played. 12. The body of directors of a corporation, a company, or other organization."

*The Oxford English Dictionary* has 19 major listings and numerous sublistings for the word "court". *Black's Law Dictionary*, in an effort to be thorough, provides pages of alternatives which cannot be resorted to restrictively. Perhaps the most restrictive is the tenth definition of "court" in *Webster's New International Dictionary* (2d ed.):

"10. *Law.* a The hall, chamber, or place where justice is administered. b The persons duly assembled under authority of law for the administration of justice, whether specifically appointed to exercise only judicial powers, as most

modern courts, or combining judicial with legislative powers, as often formerly, and still in some cases, as that of the British Parliament, the legislature of Massachusetts, etc.; an official assembly legally met together for the transaction of judicial business; a judge or judges sitting for the hearing or trial of causes. c A tribunal established for the administration of justice. d The judge or judges, as distinguished from the counsel or jury. e The session of a judicial assembly."

Even that does not fulfill the hopes of the majority since the administrative proceeding before the Real Estate Commission is judicial in nature. See Md. Code, Art. 56, §§ 224-225.

The second prong of the majority's reasoning relies upon a statutory interpretation device resorted to by courts only when they have no other crutch upon which to lean in their search for Legislative intent:

"The Legislature, which is presumed to know of the interpretations made of statutes by the Attorney General, *Jackson Marine Sales v. St. Dept.*, 32 Md. App. 213, 359 A. 2d 228 (1976) [*cert. den.* 278 Md. 725 (9/24/76)]; *Demory Brothers v. Bd. of Pub. Works*, 20 Md. App. 467, 316 A. 2d 529 (1974), *aff'd*, 273 Md. 320, 329 A. 2d 674 (1974); *see also Crest Investment Trust, Inc. v. Cohen*, 245 Md. 639, 648, 227 A. 2d 8, 13 (1967); *Read Drug & Chemical Co. v. Claypoole*, 165 Md. 250, 257-58, 166 A. 742, 745 (1933), has met at least annually since then Attorney General Hammond handed down his opinion in 1951, but that body has not changed the statute. Thus, the General Assembly has *sub silentio* tacitly approved the Attorney General's interpretation." Majority Opinion p. 342.

As so often happens in the law, the original sound reasoning of one case is used synergistically to reach one decision, then another, over the years. When a more distinctive factual premise arises, one of the synergistic

elements is isolated and used to support a cause wherein the other elements, including those necessary to the original reasoning, are inapposite. That is what has occurred here.

In seeking Legislative intent, courts since the inception of our judicial system have held that they should refrain from interpreting a statute differently from the prevailing administrative interpretation except for the most potent and urgent reasons. See *Hays v. Richardson*, 1 G & J 366; *Salisbury Beauty School v. St. Bd.*, 268 Md. 32, 65-66. Administrative construction and enforcement remains an important interpretive guide, see *Public Serv. Comm'n v. Howard Res.*, 271 Md. 141, 150-152, and our reports are replete with the variety of its application.

That rule was at the base of the 1933 opinion in *Read Drug & Chem. Co. v. Claypoole*, 165 Md. 250, but there an Attorney General's opinion was relied upon to show, first, what the administrative interpretation was, and second, as a makeweight by saying that the legal opinion as well as the administrative construction should be given great weight:

"... such legal interpretation *and* administrative construction should be given great consideration in determining the legislative intent." *Id.* at 257. (emphasis added).

What had once been a helpful interpretative guide soon became a substantial source for determining Legislative intent. By 1966, in *Crest Investment v. Cohen*, 245 Md. 639, the Court kept the makeweight and discarded the scale. There the Court relied upon the existence of a 9 year old Attorney General's opinion to an agency to infer Legislative acquiescence by silence, but failed to mention the 9 years of administrative application of the Attorney General's construction. It would appear that the Court charged the Legislature with knowledge of the opinion because it had been expressly recognized in a study commission report submitted to the Legislature. 245 Md. at 648, n. 7.

*Crest* would seem to stand on its peculiar facts had we not fallen into its trap by reciting it as a rule of statutory construction rather than a mere makeweight, *Demory*

*Brothers v. Bd. of Pub. Works,* 20 Md. App. 467, 473, *aff'd* 273 Md. 320, although we later preserved the distinction of limiting the Attorney General's opinion to its peculiar role as added support to the administrative-construction-and-enforcement principle. See *Jackson Marine Sales v. St. Dep't,* 32 Md. App. 213, 217, *cert. den.* 278 Md. 725 (9/24/76).

It is time we placed this interpretative guide in proper perspective, instead of perpetuating its unwarranted growth. An Attorney General's opinion is simply the considered opinion of another lawyer. If that opinion is solicited and received by the General Assembly, or was before it as of record, the Legislature can honestly be charged with its knowledge and an inference can be drawn from subsequent inaction. But for a court to charge the Legislature with the knowledge of every opinion rendered to every agency, department, board or other State institution demands too much credulity for even an appellate court. Perhaps contrary to our own sense of self-esteem, common sense tells us that those overburdened public servants probably do not even have time to read our opinions, let alone the myriad rendered by the Attorney General upon every official request. I would restrict this presumed knowledge — silent acquiescence — to its limited role, or discard it altogether in reaching for the Legislative intent when interpreting an unclear statute.

On the other hand, the Legislature *can* be charged with knowledge of the administration of its laws and their consequent administrative interpretation. It annually appropriates funds to effect that administration and has standing committees statutorily created to review administrative procedure and conduct. Md. Code, Art. 40, § 40A. There is also some logic in pointing out an Attorney General's interpretation submitted to the administrative agency, to indicate with precision what construction had been placed upon the statute by the agency.

It is, of course, only when the words of a statute are not definite and free of ambiguity that we need seek Legislative intent. But when the meaning is ambiguous, the verbal

significance may be divined by examining the evil the Legislature sought to inhibit, *Stoll v. Baltimore*, 163 Md. 282, 292, and it is the language of the statute itself that provides the primary source for determining Legislative intent. *State v. Fabritz*, 276 Md. 416, 421.

It is my opinion that the statute of limitations now found in Md. Code, Cts. Art., § 5-107, was intended from its inception to relate only to *monetary* "fines", *monetary* "penalties" and *monetary* "forfeitures". If that be so the license revocation hearing would not be subject to the one year limitation. This view can be justified by *Black's Law Dictionary* definitions of the words used in the statute. "Fine" is defined as meaning:

> "To impose a pecuniary punishment or mulct.
>
> To sentence a person convicted of an offense to pay a penalty in money."

"Penalty" and "forfeiture" carry a variety of meanings. However, under the rule of *ejusdem generis*, we do not construe those terms in their broadest sense but apply them only to things of the same general kind or class as that specifically mentioned, *i.e.*, "fine". Therefore, an alternative definition in *Black's* for the term "penalty" is most ·appropriate here:

> "The term also denotes money recoverable by virtue of a statute imposing a payment by way of punishment." (authorities deleted).

The same rule of interpretation applies to "forfeiture". The ninth definition in *Black's* is the most appropriate in context:

> "9. A thing or sum of money forfeited. Something imposed as a punishment for an offense or delinquency. The word in this sense is frequently associated with the word 'penalty.'" (authorities deleted).

Applying the rule of *ejusdem generis* is not only a reasonable application but a most appropriate one in light of

the Legislative history. While we should construe limitations statutes in furtherance of their objectives, *Green v. Johnson*, 3 G & J 389, their objectives must often be found in light of the purposes and objects sought to be attained by their enactment. See *McMahan v. Dorchester Fert. Co.*, 184 Md. 155, 159-160. The time and circumstances under which a statute was originally passed should be taken into consideration in ascertaining the true intention of the Legislature. *Maurice v. Worden*, 52 Md. 283, 294.

The original enactment of § 5-107 was as a last clause after-thought, applied to a lengthy procedural law entitled:

"An Act to direct in which manner all fines, forfeitures and penalties, shall be recovered, and in what manner fines, forfeitures, penalties and amerciaments, shall be applied." *Dorsey's Laws of Maryland.—1777*, Ch. 6.

The entire statute dealt with money payments for wrongful acts, by whatever name called. Even when it was first changed, Laws 1801, Ch. 74, § 32, it still dealt with monetary penalties. Nowhere is there apparent in its history any indication that the Legislature ever intended to deviate from applying a one year limitation upon the institution of a suit or prosecution for any "fine, penalty, or forfeiture" *other than in a pecuniary sense.*

Therefore, if reasons need to be assigned for our interpretation of that statute, I would have felt more comfortable in seeking Legislative intent through statutory history than by relying on a presumed tacit acquiescence in a lawyer's opinion rendered to someone else, and an analogy between a licensed business and a learned profession.